## RICHARDSON, SECRETARY OF HEALTH, EDUCATION, AND WELFARE v. PERALES

No. 108. Argued January 13, 1971—Decided May 3, 1971

BLACKMUN, J., delivered the opinion of the Court, in which BURGER, C. J., and HARLAN, STEWART, WHITE, and MARSHALL, JJ., joined. DOUGLAS, J., filed a dissenting opinion, in which BLACK and BRENNAN, JJ., joined, post, p. 411.

*Deputy Solicitor General Friedman* argued the cause for petitioner. With him on the briefs were *Solicitor General Griswold, Assistant Attorney General Ruckelshaus, Assistant Attorney General Gray, Lawrence G. Wallace, Kathryn H. Baldwin,* and *Michael C. Farrar.*

*Richard Tinsman,* by appointment of the Court, 398 U. S. 902, argued the cause and filed a brief for respondent.

Briefs of *amici curiae* were filed by *Franklin M. Schultz* and *John T. Miller, Jr.,* for the American Bar Association; by *Frank P. Christian, Harry B. Adams III,* and *Melvin N. Eichelbaum* for the Bexar County Legal Aid Association; and by *Jonathan Weiss* for the Appalachian Research and Defense Fund et al.

MR. JUSTICE BLACKMUN delivered the opinion of the Court.

In 1966 Pedro Perales, a San Antonio truck driver, then aged 34, height 5′ 11″, weight about 220 pounds, filed a claim for disability insurance benefits under the Social Security Act. Sections 216 (i)(1), 68 Stat. 1080, and 223 (d)(1), 81 Stat. 868, of that Act, 42 U. S. C. § 416 (i)(1) and 42 U. S. C. § 423 (d)(1) (1964 ed., Supp. V), both provide that the term "disability" means "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . ."[1] Section 205 (g), 42 U. S. C. § 405 (g), relating to judicial review, states, "The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive . . . ."

The issue here is whether physicians' written reports of medical examinations they have made of a disability claimant may constitute "substantial evidence" supportive of a finding of nondisability, within the § 205 (g) standard, when the claimant objects to the admissibility of those reports and when the only live testimony is presented by his side and is contrary to the reports.

I

In his claim Perales asserted that on September 29, 1965, he became disabled as a result of an injury to his back sustained in lifting an object at work. He was seen by a neurosurgeon, Dr. Ralph A. Munslow, who first recommended conservative treatment. When this provided no relief, myelography was performed and surgery for a possible protruded intervertebral disc at L–5 was advised. The patient at first hesitated about surgery

---

[1] Not pertinent here are the durational aspects of disability specified in the statute's definition.

and appeared to improve. On recurrence of pain, however, he consented to the recommended procedure. Dr. Munslow operated on November 23. The surgical note is in the margin.[2] No disc protrusion or other definitive pathology was identified at surgery. The post-operative diagnosis was: "Nerve root compression syndrome, left." The patient was discharged from Dr. Munslow's care on January 25, 1966, with a final diagnosis of "Neuritis, lumbar, mild."

Mr. Perales continued to complain, but Dr. Munslow and Dr. Morris H. Lampert, a neurologist called in consultation, were still unable to find any objective neurological explanation for his complaints. Dr. Munslow advised that he return to work.

In April 1966 Perales consulted Dr. Max Morales, Jr., a general practitioner of San Antonio. Dr. Morales hospitalized the patient from April 15 to May 2. His final

[2] "Midline incision is made in upper border of the spine of L4 downward in the midline to the upper sacrum. Dissection is carried down and in the subperiosteal space exposing the interspaces at L4–5 and L5 S1. At each interspace, partial laminectomy is carried out on the left and of the bone adjacent to the interspace followed by resection of the intervening ligament in order that the interspace could be thoroughly explored both by inspection as well as by palpation. In each instance, there was no protrusion of the disc identified. Further resection downward over the sacrum is carried out in order that we do not overlook the fragment of disc that may have extruded extra-durally in this space but none is found.

"There seems to be more tightness of structures particularly of the roots in the dural sac and the lumbar area than one usually encountered. It is felt that this is the situation representing the root compression syndrome, the exact mechanics of which is not apparent. It is felt that for this reason that hemilaminectomy of the left L–5 would afford the patient additional decompression and this is carried out. After this had been done the dural sac bulges upward in a more normal position. Repeat inspection through the intact dura reveals no evidence of an intradural mass. Likewise the anterior aspect of the canal appears normal. . . ."

discharge diagnosis was: "Back sprain, lumbo-sacral spine."

Perales then filed his claim. As required by § 221 of the Act, 42 U. S. C. § 421, the claim was referred to the state agency for determination. The agency obtained the hospital records and a report from Dr. Morales. The report set forth no physical findings or laboratory studies, but the doctor again gave as his diagnosis: "Back sprain—lumbo-sacral spine," this time "moderately severe," with "Ruptured disk not ruled out." The agency arranged for a medical examination, at no cost to the patient, by Dr. John H. Langston, an orthopedic surgeon. This was done May 25.

Dr. Langston's ensuing report to the Division of Disability Determination was devastating from the claimant's standpoint. The doctor referred to Perales' being "on crutches or cane" since his injury. He noted a slightly edematous condition in the legs, attributed to "inactivity and sitting around"; slight tenderness in some of the muscles of the dorsal spine, thought to be due to poor posture; and "a very mild sprain [of those muscles] which would resolve were he actually to get a little exercise and move." Apart from this, and from the residuals of the pantopaque myelography and hemilaminectomy, Dr. Langston found no abnormalities of the lumbar spine. Otherwise, he described Perales as a "big physical healthy specimen . . . obviously holding back and limiting all of his motions, intentionally. . . . His upper extremities, though they are completely uninvolved by his injury, he holds very rigidly as though he were semi-paralyzed. His reach and grasp are very limited but intentionally so. . . . Neurological examination is entirely normal to detailed sensory examination with pinwheel, vibratory sensations, and light touch. Reflexes are very active and there is no atrophy anywhere." The

orthopedist's summarization, impression, and prognosis are in the margin.[3]

The state agency denied the claim. Perales requested reconsideration. Dr. Morales submitted a further report to the agency and an opinion to the claimant's attorney. This outlined the surgery and hospitalizations and his own conservative and continuing treatment of the patient, the medicines prescribed, the administration of ultrasound therapy, and the patient's constant complaints. The doctor concluded that the patient had not made a complete recovery from his surgery, that he was not malingering, that his injury was permanent, and that he was totally and permanently disabled.[4] He recommended against any further surgery.

---

[3] "IMPRESSION: He may have a very mild chronic back sprain associated with the congenital anomalies as seen on x-ray, but it has been a long time since I have been so impressed with the obvious attempt of a patient to exaggerate his difficulties by simply just standing there and not moving—not even the uninvolved upper extremities. Thus, he has a tremendous psychological overlay to this illness, and I sincerely suggest that he be seen by a psychiatrist.

"PROGNOSIS: He should have intensive physio-therapy in the form of active exercise, including walking, bicycling, and an all out attempt at conservative rehabilitation. Were he to follow this program, and were it to be effective, I would estimate the time necessary at about three to six months. This is also considering that he does not have any serious psychiatric disease, though he obviously does have a tremendous psychological overlay to his illness."

[4] "Diagnosis in this case should be considered as crush injury to disc in the lumbo-sacral region of the spine resulting in either a ruptured disc or a slipped disc which was subsequently operated on by Dr. Ralph Munslow. Since the operation, the patient has not made a complete recovery; on the contrary, the patient continues to complain as bitterly now as he did prior to surgery.

"Since I started seeing this patient on April 13, I have had occasion to see and talk with him over 30 times. During this period and with this number of visits, I have become thoroughly convinced that this man is not malingering. I am completely convinced of his

The state agency then arranged for an examination by Dr. James M. Bailey, a board-certified psychiatrist with a subspecialty in neurology. Dr. Bailey's report to the agency on August 30, 1966, concluded with the following diagnosis:

> "Paranoid personality, manifested by hostility, feelings of persecution and long history of strained interpersonal relationships.
>
> "I do not feel that this patient has a separate ˗ psychiatric illness at this time. It appears that his personality is conducive to anger, frustrations, etc."

The agency again reviewed the file. The Bureau of Disability Insurance of the Social Security Administration made its independent review. The report and opinion of Dr. Morales, as the claimant's attending physician, were considered, as were those of the other examining physicians. The claim was again denied.

Perales requested a hearing before a hearing examiner. The agency then referred the claimant to Dr. Langston and to Dr. Richard H. Mattson for electromyography studies. Dr. Mattson's notes referred to "some chronic or past disturbance of function in the nerve supply" to the left and right anterior tibialis muscles and right

---

sincerity and of the genuine and truthful nature of his complaints. From my own observations and from physical examination, it is my considered opinion that this patient has indeed an injury to the lumbo-sacral region of the spine which has not been corrected by surgery. My opinion is that the injury sustained is of a permanent nature and that as things presently stand, the patient is totally, completely, and permanently disabled. It is my considered opinion that this patient in the condition in which he finds himself at this time would not be able to continue gainful employment as a common laborer. Inasmuch as this patient has had previous surgery to the affected area, I do not know that further surgery would have anything to offer him, and have told him that about the most I could offer him would be a support belt to help relieve the symptoms, by the use of a walking cane, and analgesics for relief of the symptoms."

extensor digitorium brevis muscles that was "strongly
suggestive of lack of maximal effort" and was "the kind
of finding that is typically associated with a functional
or psychogenic component to weakness." There was no
evidence of "any active process effecting [*sic*] the nerves
at present." Dr. Langston advised the agency that Dr.
Mattson's finding of "very poor effort" verified what Dr.
Langston had found on the earlier physical examination.

The requested hearing was set for January 12, 1967,
in San Antonio. Written notice thereof was given the
claimant with a copy to his attorney. The notice con-
tained a definition of disability, advised the claimant
that he should bring all medical and other evidence not
already presented, afforded him an opportunity to ex-
amine all documentary evidence on file prior to the hear-
ing, and told him that he might bring his own physician
or other witnesses and be represented at the hearing by
a lawyer.

The hearing took place at the time designated. A
supplemental hearing was held March 31. The claimant
appeared at the first hearing with his attorney and with
Dr. Morales. The attorney formally objected to the in-
troduction of the several reports of Drs. Langston, Bailey,
Mattson, and Lampert, and of the hospital records.
Various grounds of objection were asserted, including
hearsay, absence of an opportunity for cross-examination,
absence of proof the physicians were licensed to practice
in Texas, failure to demonstrate that the hospital records
were proved under the Business Records Act, and the
conclusory nature of the reports. These objections were
overruled and the reports and hospital records were intro-
duced. The reports of Dr. Morales and of Dr. Munslow
were then submitted by the claimant's counsel and
admitted.

At the two hearings oral testimony was submitted by
claimant Perales, by Dr. Morales, by a former fellow

employee of the claimant, by a vocational expert, and by Dr. Lewis A. Leavitt, a physician board-certified in physical medicine and rehabilitation, and chief of, and professor in, the Department of Physical Medicine at Baylor University College of Medicine. Dr. Leavitt was called by the hearing examiner as an independent "medical adviser," that is, as an expert who does not examine the claimant but who hears and reviews the medical evidence and who may offer an opinion. The adviser is paid a fee by the Government. The claimant, through his counsel, objected to any testimony by Dr. Leavitt not based upon examination or upon a hypothetical. Dr. Leavitt testified over this objection and was cross-examined by the claimant's attorney. He stated that the consensus of the various medical reports was that Perales had a mild low-back syndrome of musculo-ligamentous origin.

The hearing examiner, in reliance upon the several medical reports and the testimony of Dr. Leavitt, observed in his written decision, "There is objective medical evidence of impairment which the heavy preponderance of the evidence indicates to be of mild severity. . . . Taken altogether, the Hearing Examiner is of the conclusion that the claimant has not met the burden of proof." He specifically found that the claimant "is suffering from a low back syndrome of musculo-ligamentous origin, and of mild severity"; that while he "has an emotional overlay to his medical impairment it does not require psychiatric treatment and is of minimal contribution, if any, to his medical impairment or to his general ability to engage in substantial gainful activity"; that "[n]either his medical impairment nor his emotional overlay, singly or in combination, constitute a disability as defined" in the Act; and that the claimant is capable of engaging as a salesman in work in which he had previously engaged, of working as a watchman or

guard where strenuous activity is not required, or as a ticket-taker or janitor. The hearing examiner's decision, then, was that the claimant was not entitled to a period of disability or to disability insurance benefits.

It is to be noted at this point that § 205 (d) of the Act, 42 U. S. C. § 405 (d), provides that the Secretary has power to issue subpoenas requiring the attendance and testimony of witnesses and the production of evidence and that the Secretary's regulations, authorized by § 205 (a), 42 U. S. C. § 405 (a), provide that a claimant may request the issuance of subpoenas, 20 CFR § 404.926. Perales, however, who was represented by counsel, did not request subpoenas for either of the two hearings.

The claimant then made a request for review by the Appeals Council and submitted as supplemental evidence a judgment dated June 2, 1967, in Perales' favor against an insurance company for workmen's compensation benefits aggregating $11,665.84, plus medical and related expenses, and a medical report letter dated December 28, 1966, by Dr. Coyle W. Williams, apparently written in support of a welfare claim made by Perales. In his letter the doctor noted an essentially negative neurological and physical examination except for tenderness in the lumbar area and limited straight leg raising. He observed, "I cannot explain all his symptoms on a physical basis. I would recommend he would re-condition himself and return to work. My estimation, he has a 15% permanent partial disability the body as a whole." The Appeals Council ruled that the decision of the hearing examiner was correct.

Upon this adverse ruling the claimant instituted the present action for review pursuant to § 205 (g). Each side moved for summary judgment on the administrative transcript. The District Court stated that it was reluctant to accept as substantial evidence the opinions of medical

experts submitted in the form of unsworn written reports, the admission of which would have the effect of denying the opposition an opportunity for cross-examination; that the opinion of a doctor who had never examined the claimant is entitled to little or no probative value, especially when opposed by substantial evidence including the oral testimony of an examining physician; and that what was before the court amounted to hearsay upon hearsay. The case was remanded for a new hearing before a different examiner. *Perales* v. *Secretary,* 288 F. Supp. 313 (WD Tex. 1968). On appeal the Fifth Circuit noted the absence of any request by the claimant for subpoenas and held that, having this right and not exercising it, he was not in a position to complain that he had been denied the rights of confrontation and of cross-examination. It held that the hearsay evidence in the case was admissible under the Act; that, specifically, the written reports of the physicians were admissible in the administrative hearing; that Dr. Leavitt's testimony also was admissible; but that all this evidence together did not constitute substantial evidence when it was objected to and when it was contradicted by evidence from the only live witnesses. *Cohen* v. *Perales,* 412 F. 2d 44 (1969).

On rehearing, the Court of Appeals observed that it did not mean by its opinion that uncorroborated hearsay could never be substantial evidence supportive of a hearing examiner's decision adverse to a claimant. It emphasized that its ruling that uncorroborated hearsay could not constitute substantial evidence was applicable only when the claimant had objected and when the hearsay was directly contradicted by the testimony of live medical witnesses and by the claimant in person. *Cohen* v. *Perales,* 416 F. 2d 1250 (1969). Certiorari was granted in order to review and resolve this important procedural due process issue. 397 U. S. 1035 (1970).

## II

We therefore are presented with the not uncommon situation of conflicting medical evidence. The trier of fact has the duty to resolve that conflict. We have, on the one hand, an absence of objective findings, an expressed suspicion of only functional complaints, of malingering, and of the patient's unwillingness to do anything about remedying an unprovable situation. We have, on the other hand, the claimant's and his personal physician's earnest pleas that significant and disabling residuals from the mishap of September 1965 are indeed present.

The issue revolves, however, around a system which produces a mass of medical evidence in report form. May material of that kind ever be "substantial evidence" when it stands alone and is opposed by live medical evidence and the client's own contrary personal testimony? The courts below have held that it may not.

## III

The Social Security Act has been with us since 1935. Act of August 14, 1935, 49 Stat. 620. It affects nearly all of us. The system's administrative structure and procedures, with essential determinations numbering into the millions, are of a size and extent difficult to comprehend. But, as the Government's brief here accurately pronounces, "Such a system must be fair—and it must work." [5]

Congress has provided that the Secretary

"shall have full power and authority to make rules and regulations and to establish procedures . . . necessary or appropriate to carry out such provisions, and shall adopt reasonable and proper rules and

---

[5] Brief 14.

regulations to regulate and provide for the nature and extent of the proofs and evidence and the method of taking and furnishing the same in order to establish the right to benefits hereunder." § 205 (a), 42 U. S. C. § 405 (a).

Section 205 (b) directs the Secretary to make findings and decisions; on request to give reasonable notice and opportunity for a hearing; and in the course of any hearing to receive evidence. It then provides:

"Evidence may be received at any hearing before the Secretary even though inadmissible under rules of evidence applicable to court procedure."

In carrying out these statutory duties the Secretary has adopted regulations that state, among other things:

"The hearing examiner shall inquire fully into the matters at issue and shall receive in evidence the testimony of witnesses and any documents which are relevant and material to such matters. . . . The . . . procedure at the hearing generally . . . shall be in the discretion of the hearing examiner and of such nature as to afford the parties a reasonable opportunity for a fair hearing." 20 CFR § 404.927.

From this it is apparent that (a) the Congress granted the Secretary the power by regulation to establish hearing procedures; (b) strict rules of evidence, applicable in the courtroom, are not to operate at social security hearings so as to bar the admission of evidence otherwise pertinent; and (c) the conduct of the hearing rests generally in the examiner's discretion. There emerges an emphasis upon the informal rather than the formal. This, we think, is as it should be, for this administrative procedure, and these hearings, should be understandable to the layman claimant, should not necessarily be stiff and comfortable only for the trained attorney, and should

be liberal and not strict in tone and operation. This is the obvious intent of Congress so long as the procedures are fundamentally fair.

## IV

With this background and this atmosphere in mind, we turn to the statutory standard of "substantial evidence" prescribed by § 205 (g). The Court has considered this very concept in other, yet similar, contexts. The National Labor Relations Act, § 10 (e), in its original form, provided that the NLRB's findings of fact "if supported by evidence, shall be conclusive." 49 Stat. 454. The Court said this meant "supported by substantial evidence" and that this was

> "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co.* v. *NLRB,* 305 U. S. 197, 229 (1938).

The Court has adhered to that definition in varying statutory situations. See *NLRB* v. *Columbian Enameling & Stamping Co.,* 306 U. S. 292, 300 (1939); *Universal Camera Corp.* v. *NLRB,* 340 U. S. 474, 477–487 (1951); *Consolo* v. *Federal Maritime Comm'n,* 383 U. S. 607, 619–620 (1966).

## V

We may accept the propositions advanced by the claimant, some of them long established, that procedural due process is applicable to the adjudicative administrative proceeding involving "the differing rules of fair play, which through the years, have become associated with differing types of proceedings," *Hannah* v. *Larche,* 363 U. S. 420, 442 (1960); that "the 'right' to Social Security benefits is in one sense 'earned,'" *Flemming* v. *Nestor,* 363 U. S. 603, 610 (1960); and that the

> "extent to which procedural due process must be afforded the recipient is influenced by the extent to

which he may be 'condemned to suffer grievous loss'. . . . Accordingly . . . 'consideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action.' " *Goldberg* v. *Kelly,* 397 U. S. 254, 262–263 (1970).

The question, then, is as to what procedural due process requires with respect to examining physicians' reports in a social security disability claim hearing.

We conclude that a written report by a licensed physician who has examined the claimant and who sets forth in his report his medical findings in his area of competence may be received as evidence in a disability hearing and, despite its hearsay character and an absence of cross-examination, and despite the presence of opposing direct medical testimony and testimony by the claimant himself, may constitute substantial evidence supportive of a finding by the hearing examiner adverse to the claimant, when the claimant has not exercised his right to subpoena the reporting physician and thereby provide himself with the opportunity for cross-examination of the physician.

We are prompted to this conclusion by a number of factors that, we feel, assure underlying reliability and probative value:

1. The identity of the five reporting physicians is significant. Each report presented here was prepared by a practicing physician who had examined the claimant.[6] A majority (Drs. Langston, Bailey, and Mattson) were

---

[6] Although, as noted above, one stated ground of objection was the absence of proof of the physicians' Texas licensure, we do not understand that there is any serious issue as to the possession of Texas licenses by Drs. Munslow, Lampert, Langston, Bailey, and Mattson.

called into the case by the state agency. Although each received a fee, that fee is recompense for his time and talent otherwise devoted to private practice or other professional assignment. We cannot, and do not, ascribe bias to the work of these independent physicians, or any interest on their part in the outcome of the administrative proceeding beyond the professional curiosity a dedicated medical man possesses.

2. The vast workings of the social security administrative system make for reliability and impartiality in the consultant reports. We bear in mind that the agency operates essentially, and is intended so to do, as an adjudicator and not as an advocate or adversary. This is the congressional plan. We do not presume on this record to say that it works unfairly.[7]

3. One familiar with medical reports and the routine of the medical examination, general or specific, will recognize their elements of detail and of value. The particular reports of the physicians who examined claimant Perales were based on personal consultation and personal examination and rested on accepted medical procedures and tests. The operating neurosurgeon, Dr. Munslow, provided his pre-operative observations and diagnosis, his findings at surgery, his post-operative diagnosis, and his post-operative observations. Dr. Lampert, the neurologist, provided the history related to him by the patient, Perales' complaints, the physical examination and neurologic tests, and his professional impressions and recommendations. Dr. Langston, the orthopedist, did the same post-operatively, and described the orthopedic tests and

---

[7] We are advised by the Government's brief, p. 18, nn. 7 and 8, that in fiscal 1968, 515,938 disability claims were processed; that, of these, 343,628 (66.601%) were allowed prior to the hearing stage; that approximately one-third of the claims that went to hearing were allowed; and that 320,164 consultant examinations were obtained.

neurologic examination he performed, the results and his impressions and prognosis. Dr. Mattson, who did the post-operative electromyography, described the results of that test, and his impressions. And Dr. Bailey, the psychiatrist, related the history, the patient's complaints, and the psychiatric diagnosis that emerged from the typical psychiatric examination.

These are routine, standard, and unbiased medical reports by physician specialists concerning a subject whom they had seen. That the reports were adverse to Perales' claim is not in itself bias or an indication of nonprobative character.

4. The reports present the impressive range of examination to which Perales was subjected. A specialist in neurosurgery, one in neurology, one in psychiatry, one in orthopedics, and one in physical medicine and rehabilitation add up to definitive opinion in five medical specialties, all somewhat related, but different in their emphases. It is fair to say that the claimant received professional examination and opinion on a scale beyond the reach of most persons and that this case reveals a patient and careful endeavor by the state agency and the examiner to ascertain the truth.

5. So far as we can detect, there is no inconsistency whatsoever in the reports of the five specialists. Yet each result was reached by independent examination in the writer's field of specialized training.

6. Although the claimant complains of the lack of opportunity to cross-examine the reporting physicians, he did not take advantage of the opportunity afforded him under 20 CFR § 404.926 to request subpoenas for the physicians. The five-day period specified by the regulation for the issuance of the subpoenas surely afforded no real obstacle to this, for he was notified that the documentary evidence on file was available for examination before the hearing and, further, a supple-

mental hearing could be requested. In fact, in this very case there was a supplemental hearing more than two and a half months after the initial hearings. This inaction on the claimant's part supports the Court of Appeals' view, 412 F. 2d, at 50–51, that the claimant as a consequence is to be precluded from now complaining that he was denied the rights of confrontation and cross-examination.

7. Courts have recognized the reliability and probative worth of written medical reports even in formal trials and, while acknowledging their hearsay character, have admitted them as an exception to the hearsay rule. Notable is Judge Parker's well-known ruling in the war-risk insurance case of *Long* v. *United States*, 59 F. 2d 602, 603–604 (CA4 1932), which deserves quotation here, but which, because of its length, we do not reproduce. The Second Circuit has made a like ruling in *White* v. *Zutell*, 263 F. 2d 613, 615 (1959), and in so doing, relied on the Business Records Act, 28 U. S. C. § 1732.

8. Past treatment by reviewing courts of written medical reports in social security disability cases is revealing. Until the decision in this case, the courts of appeals, including the Fifth Circuit, with only an occasional criticism of the medical report practice,[8] uniformly recognized reliability and probative value in such reports. The courts have reviewed administrative determinations, and upheld many adverse ones, where the only supporting evidence has been reports of this kind, buttressed sometimes, but often not, by testimony of a medical adviser such as Dr. Leavitt.[9] In these cases admissibility was

---

[8] *Ratliff* v. *Celebrezze*, 338 F. 2d 978, 982 (CA6 1964); but see *Miracle* v. *Celebrezze*, 351 F. 2d 361, 365, 382–383 (CA6 1965).

[9] *Ber* v. *Celebrezze*, 332 F. 2d 293, 296–298 (CA2 1964); *Stancavage* v. *Celebrezze*, 323 F. 2d 373, 374 (CA3 1963); *Dupkunis* v. *Celebrezze*, 323 F. 2d 380, 382 (CA3 1963); *Cochran* v. *Celebrezze*, 325 F. 2d 137, 138 (CA4 1963); *Cuthrell* v. *Celebrezze*, 330 F. 2d

not contested, but the decisions do demonstrate traditional and ready acceptance of the written medical report in social security disability cases.

9. There is an additional and pragmatic factor which, although not controlling, deserves mention. This is what Chief Judge Brown has described as "[t]he sheer magnitude of that administrative burden," and the resulting necessity for written reports without "elaboration through the traditional facility of oral testimony." *Page* v. *Celebrezze,* 311 F. 2d 757, 760 (CA5 1963). With over 20,000 disability claim hearings annually, the cost of providing live medical testimony at those hearings, where need has not been demonstrated by a request for a subpoena, over and above the cost of the examinations requested by hearing examiners, would be a substantial drain on the trust fund and on the energy of physicians already in short supply.

## VI

1. Perales relies heavily on the Court's holding and statements in *Goldberg* v. *Kelly, supra,* particularly the comment that due process requires notice "and an effective opportunity to defend by confronting any adverse witnesses . . . ." 397 U. S., at 267–268. *Kelly,* however,

---

48, 50–51 (CA4 1964); *Aldridge* v. *Celebrezze,* 339 F. 2d 190, 191 (CA5 1964); *Dodsworth* v. *Celebrezze,* 349 F. 2d 312, 313–314 (CA5 1965); *Bridges* v. *Gardner,* 368 F. 2d 86, 89 (CA5 1966); *Green* v. *Gardner,* 391 F. 2d 606 (CA5 1968); *Martin* v. *Finch,* 415 F. 2d 793, 794 (CA5 1969); *Breaux* v. *Finch,* 421 F. 2d 687, 689 (CA5 1970); *Phillips* v. *Celebrezze,* 330 F. 2d 687, 689 (CA6 1964); *Justice* v. *Gardner,* 360 F. 2d 998, 1000–1001 (CA6 1966); *Moon* v. *Celebrezze,* 340 F. 2d 926, 928 (CA7 1965); *Pierce* v. *Gardner,* 388 F. 2d 846, 847 (CA7 1967), cert. denied, 393 U. S. 885; *Celebrezze* v. *Sutton,* 338 F. 2d 417, 419–420 (CA8 1964); *Brasher* v. *Celebrezze,* 340 F. 2d 413, 414 (CA8 1965); *McMullen* v. *Celebrezze,* 335 F. 2d 811, 815 (CA9 1964), cert. denied, 382 U. S. 854; *Flake* v. *Gardner,* 399 F. 2d 532, 534 (CA9 1968); *Celebrezze* v. *Warren,* 339 F. 2d 833, 836 (CA10 1964); *McMillin* v. *Gardner,* 384 F. 2d 596, 597 (CA10 1967).

had to do with termination of AFDC benefits without prior notice. It also concerned a situation, the Court said, "where credibility and veracity are at issue, as they must be in many termination proceedings." 397 U. S., at 269.

The *Perales* proceeding is not the same. We are not concerned with termination of disability benefits once granted. Neither are we concerned with a change of status without notice. Notice was given to claimant Perales. The physicians' reports were on file and available for inspection by the claimant and his counsel. And the authors of those reports were known and were subject to subpoena and to the very cross-examination that the claimant asserts he has not enjoyed. Further, the specter of questionable credibility and veracity is not present; there is professional disagreement with the medical conclusions, to be sure, but there is no attack here upon the doctors' credibility or veracity. *Kelly* affords little comfort to the claimant.

2. Perales also, as the Court of Appeals stated, 412 F. 2d, at 53, 416 F. 2d, at 1251, would describe the medical reports in question as "mere uncorroborated hearsay" and would relate this to Mr. Chief Justice Hughes' sentence in *Consolidated Edison Co.* v. *NLRB*, 305 U. S., at 230: "Mere uncorroborated hearsay or rumor does not constitute substantial evidence."

Although the reports are hearsay in the technical sense, because their content is not produced live before the hearing examiner, we feel that the claimant and the Court of Appeals read too much into the single sentence from *Consolidated Edison.* The contrast the Chief Justice was drawing, at the very page cited, was not with material that would be deemed formally inadmissible in judicial proceedings but with material "without a basis in evidence having rational probative force." This was not a blanket rejection by the Court of administrative

reliance on hearsay irrespective of reliability and probative value. The opposite was the case.

3. The claimant, the District Court, and the Court of Appeals also criticize the use of Dr. Leavitt as a medical adviser. 288 F. Supp., at 314, 412 F. 2d, at 53–54. See also *Mefford* v. *Gardner*, 383 F. 2d 748, 759–761 (CA6 1967). Inasmuch as medical advisers are used in approximately 13% of disability claim hearings, comment as to this practice is indicated. We see nothing "reprehensible" in the practice, as the claimant would describe it. The trial examiner is a layman; the medical adviser is a board-certified specialist. He is used primarily in complex cases for explanation of medical problems in terms understandable to the layman-examiner. He is a neutral adviser. This particular record discloses that Dr. Leavitt explained the technique and significance of electromyography. He did offer his own opinion on the claimant's condition. That opinion, however, did not differ from the medical reports. Dr. Leavitt did not vouch for the accuracy of the facts assumed in the reports. No one understood otherwise. See *Doe* v. *Department of Transportation*, 412 F. 2d 674, 678–680 (CA8 1969). We see nothing unconstitutional or improper in the medical adviser concept and in the presence of Dr. Leavitt in this administrative hearing.

4. Finally, the claimant complains of the system of processing disability claims. He suggests, and is joined in this by the briefs of *amici*, that the Administrative Procedure Act, rather than the Social Security Act, governs the processing of claims and specifically provides for cross-examination, 5 U. S. C. § 556 (d) (1964 ed., Supp. V). The claimant goes on to assert that in any event the hearing procedure is invalid on due process grounds. He says that the hearing examiner has the responsibility for gathering the evidence and "to make the

Government's case as strong as possible"; that naturally he leans toward a decision in favor of the evidence he has gathered; that justice must satisfy the appearance of justice, citing *Offutt* v. *United States,* 348 U. S. 11, 14 (1954), and *In re Murchison,* 349 U. S. 133, 136 (1955); and that an "independent hearing examiner such as in the" Longshoremen's and Harbor Workers' Compensation Act should be provided.

We need not decide whether the APA has general application to social security disability claims, for the social security administrative procedure does not vary from that prescribed by the APA. Indeed, the latter is modeled upon the Social Security Act. See Final Report of the Attorney General's Committee on Administrative Procedure, contained in Administrative Procedure in Government Agencies, S. Doc. No. 8, 77th Cong., 1st Sess., 157 (1941); see also the remarks of Senator McCarran, chairman of the Judiciary Committee of the Senate, 92 Cong. Rec. 2155. The cited § 556 (d) provides that any documentary evidence "may be received" subject to the exclusion of the irrelevant, the immaterial, and the unduly repetitious. It further provides that a "party is entitled to present his case or defense by oral or documentary evidence . . . and to conduct such cross-examination as may be required for a full and true disclosure of the facts" and in "determining claims for money or benefits . . . an agency may, when a party will not be prejudiced thereby, adopt procedures for the submission of all or part of the evidence in written form."

These provisions conform, and are consistent with, rather than differ from or supersede, the authority given the Secretary by the Social Security Act's §§ 205 (a) and (b) "to establish procedures," and "to regulate and provide for the nature and extent of the proofs and evidence and the method of taking and furnishing the same in

order to establish the right to benefits," and to receive evidence "even though inadmissible under rules of evidence applicable to court procedure." Hearsay, under either Act, is thus admissible up to the point of relevancy.

The matter comes down to the question of the procedure's integrity and fundamental fairness. We see nothing that works in derogation of that integrity and of that fairness in the admission of consultants' reports, subject as they are to being material and to the use of the subpoena and consequent cross-examination. This precisely fits the statutorily prescribed "cross-examination as may be required for a full and true disclosure of the facts." That is the standard. It is clear and workable and does not fall short of procedural due process.

Neither are we persuaded by the advocate-judge-multiple-hat suggestion. It assumes too much and would bring down too many procedures designed, and working well, for a governmental structure of great and growing complexity. The social security hearing examiner, furthermore, does not act as counsel. He acts as an examiner charged with developing the facts. The 44.2% reversal rate for all federal disability hearings in cases where the state agency does not grant benefits, M. Rock, An Evaluation of the SSA Appeals Process, Report No. 7, U. S. Department of HEW, p. 9 (1970), attests to the fairness of the system and refutes the implication of impropriety.

We therefore reverse and remand for further proceedings. We intimate no view as to the merits. It is for the District Court now to determine whether the Secretary's findings, in the light of all material proffered and admissible, are supported by "substantial evidence" within the command of § 205 (g).

*It is so ordered.*

Mr. Justice Douglas, with whom Mr. Justice Black and Mr. Justice Brennan concur, dissenting.

This claimant for social security disability benefits had a serious back injury. The doctor who examined him testified that he was permanently disabled. His case is defeated, however, by hearsay evidence of doctors and their medical reports about this claimant. Only one doctor who examined him testified at the hearing. Five other doctors who had once examined the claimant did not testify and were not subject to cross-examination. But their reports were admitted in evidence. Still another doctor testified on the hearsay in the documents of the other doctors. All of this hearsay may be received, as the Administrative Procedure Act (5 U. S. C. § 556 (d) (1964 ed., Supp. V)) provides that "[a]ny oral or documentary evidence may be received." But this hearsay evidence cannot by itself be the basis for an adverse ruling. The same section of the Act states that "[a] party is entitled . . . to conduct such cross-examination as may be required for a full and true disclosure of the facts." [1]

---

[1] S. Rep. No. 752, 79th Cong., 1st Sess., 22–23.

"The right of cross-examination extends, in a proper case, to written evidence submitted pursuant to the last sentence of the subsection as well as to cases in which oral or documentary evidence is received in open hearing. . . . To the extent that cross-examination is necessary to bring out the truth, the party should have it. . . ."

The House Judiciary Committee expressed a like view.

"The provision on its face does not confer a right of so-called 'unlimited' cross-examination. Presiding officers will have to make the necessary initial determination whether the cross-examination is pressed to unreasonable lengths by a party or whether it is required for the 'full and true disclosure of the facts' stated in the provision. Nor is it the intention to eliminate the authority of agencies to confer sound discretion upon presiding officers in the matter of its extent. The test is—as the section states—whether it is required

As a consequence the Court of Appeals said:

"Our opinion holds, and we reaffirm, that mere uncorroborated hearsay evidence as to the physical condition of a claimant, standing alone and without more, in a social security disability case tried before a hearing examiner, as in our case, is not substantial evidence that will support a decision of the examiner adverse to the claimant, if the claimant objects to the hearsay evidence and if the hearsay evidence is directly contradicted by the testimony of live medical witnesses and by the claimant who [testifies] in person before the examiner, as was done in the case at bar." 416 F. 2d 1250, 1251.

Cross-examination of doctors in these physical injury cases is, I think, essential to a full and fair disclosure of the facts.[2]

The conclusion reached by the Court of Appeals that hearsay evidence alone is not "substantial" enough to sustain a judgment adverse to the claimant is supported not only by the Administrative Procedure Act but also by the Social Security Act itself. Although Congress provided in the Social Security Act that "[e]vidence may be received at any hearing before the Secretary even

---

'for a full and true disclosure of the facts.' . . . The right of cross-examination extends, in a proper case, to written evidence submitted pursuant to the last sentence of the section as well as to cases in which oral or documentary evidence is received in open hearing. . . . To the extent that cross-examination is necessary to bring out the truth, the party must have it. . . ." H. R. Rep. No. 1980, 79th Cong., 2d Sess., 37.

[2] While the Administrative Procedure Act allows statutory exceptions of procedures different from those in the Act, 5 U. S. C. § 556 (1964 ed., Supp. V), there is no explicit ban in the Social Security Act (42 U. S. C. § 405) against the right of cross-examination. And the Regulations of the Secretary provide that there must be "a reasonable opportunity for a fair hearing." 20 CFR § 404.927.

though inadmissible under rules of evidence applicable to court procedure," see 42 U. S. C. § 405 (b), Congress also provided that findings of the Secretary were to be conclusive only *"if supported by substantial evidence."* 42 U. S. C. § 405 (g). (Emphasis added.) Uncorroborated hearsay untested by cross-examination does not by itself constitute "substantial evidence." See *Consolidated Edison Co.* v. *NLRB,* 305 U. S. 197, 230 (1938). Particularly where, as in this case, a disability claimant appears and testifies as to the nature and extent of his injury and his family doctor testifies in his behalf supporting the fact of his disability, the Secretary should not be able to support an adverse determination on the basis of medical reports from doctors who did not testify or the testimony of an HEW employee who never even examined the claimant as a patient.

This case is minuscule in relation to the staggering problems of the Nation. But when a grave injustice is wreaked on an individual by the presently powerful federal bureaucracy, it is a matter of concern to everyone, for these days the average man can say: "There but for the grace of God go I."

One doctor whose word cast this claimant into limbo never saw him, never examined him, never took his vital statistics or saw him try to walk or bend or lift weights.

He was a "medical adviser" to HEW. The use of circuit-riding doctors who never see or examine claimants to defeat their claims should be beneath the dignity of a great nation. Three other doctors who were not subject to cross-examination were experts retained and paid by the Government. Some, we are told, who were subject to no cross-examination were employed by the workmen's compensation insurance company to defeat respondent's claim.

Judge Spears who first heard this case said that the way hearing officers parrot "almost word for word the conclusions" of the "medical adviser" produced "nausea" in him. Judge Spears added:

> "[H]earsay evidence in the nature of ex parte statements of doctors on the critical issue of a man's present physical condition is just a violation of the concept with which I am familiar and which bears upon the issue of fundamental fair play in a hearing.
>
> "Then, when you pyramid hearsay from a so-called medical advisor, who, himself, has never examined the man who claims benefits, then you just compound it—compound a situation that I simply cannot tolerate in my own mind, and I can't see why a hearing examiner wants to abrogate his duty and his responsibility and turn it over to some medical advisor."

Review of the evidence is of no value to us. The vice is in the procedure which allows it in without testing it by cross-examination. Those defending a claim look to defense-minded experts for their salvation. Those who press for recognition of a claim look to other experts. The problem of the law is to give advantage to neither, but to let trial by ordeal of cross-examination distill the truth.

The use by HEW of its stable of defense doctors without submitting them to cross-examination is the cutting of corners—a practice in which certainly the Government should not indulge. The practice is barred by the rules which Congress has provided; and we should enforce them in the spirit in which they were written.

I would affirm this judgment.