Ana SANCHEZ, Plaintiff,

v.

Shirley S. CHATER, Commissioner of Social Security,[1] Defendant.

No. 94 Civ. 5701(JES).

United States District Court, S.D. New York.

May 13, 1997.

**1.** Pursuant to the Social Security Independence and Program Improvements Act of 1994, Pub.L. No. 103–296, the functions of the Secretary of Health and Human Services in Social Security cases were transferred to the Commissioner of Social Security effective March 31, 1995. In accordance with section 106(d) of Pub.L. 103–296, the Court deems the complaint amended to substitute Shirley S. Chater, Commissioner of Social Security, for Donna E. Shalala, Secretary of Health and Human Services, as defendant.

Charles E. Binder, Binder & Binder, Hauppauge, NY, for Plaintiff

Mary Jo White, United States Attorney for the Southern District of New York, New York City (Lorraine S. Novinsky, Assistant United States Attorney, of counsel), for Defendant.

## MEMORANDUM OPINION AND ORDER

SPRIZZO, District Judge:

Plaintiff Ana Sanchez brings the instant action challenging a decision of defendant Commissioner of Social Security (the "Commissioner") denying her applications for widow's insurance benefits, social security disability benefits, and supplemental security income benefits. Pursuant to Federal Rule of Civil Procedure 12(c), Sanchez and the Commissioner cross-move for judgment on the pleadings. For the reasons set forth below, Sanchez's motion is denied and the Commissioner's motion is granted.

## BACKGROUND

Plaintiff Ana Sanchez was born on May 29, 1942, in the Dominican Republic where she met and married her late husband, Manuel Ventura. *See* Transcript of Administrative Record ("Tr.") at 28, 161–162. Together, they moved to Puerto Rico on January 15, 1967, where Sanchez worked as a tailor and textile machine operator for several different employers. Tr. at 28, 115. Sanchez's work required standing for half the workday and sitting for half the workday. Tr. at 33–34. Sanchez switched jobs on a number of occasions due to pain in her right leg, and in 1985, she stopped working entirely. Tr. at 33, 35, 53, 115. On October 24, 1987, San-

chez's husband died. Tr. at 156–60. Sanchez subsequently moved to New York where she currently shares a private home in the Bronx with her daughter. Tr. at 28–29. Sanchez's formal education ended with the completion of the fifth grade in Santa Domingo. Tr. at 31. Sanchez speaks Spanish only. Tr. at 27.

In September 1987, while living in Puerto Rico, Sanchez visited Dr. Salvador Oviedo complaining of pain and discomfort in her left knee, neck and abdomen. Tr. at 169–70. Dr. Oviedo diagnosed her as suffering from a cervical strain and allergic rhinitis.[2] *Id.*

After moving to Bronx, New York, Sanchez became a patient at Our Lady of Mercy Medical Center ("OLMMC"). Tr. at 119–155. On August 20, 1991, she was treated at OLMMC by Dr. Vinod M. Nair for complaints of chest pain radiating to her back, neck and both arms. Tr. at 120. She also complained of a sore throat and rhinitis which had lasted for three days. *Id.* Dr. Nair diagnosed Sanchez with atypical chest pain and bronchitis, provided her with Motrin, and prescribed antibiotics. Tr. at 121.

On December 27, 1991, Sanchez went to the medical clinic at OLMMC complaining of chest pain on her right side, and itching. Tr. at 135. The attending physician told Sanchez to take Ibuprofen three times a day and to make appointments with the orthopedic and dermatology clinics. *Id.* Sanchez failed to appear at the orthopedic clinic on January 15, 1992, and at the medical clinic on January 24, 1992. Tr. at 136. She did appear at the dermatology clinic on March 16, 1992, where she was treated for itching. Tr. at 138.

On April 2, 1992, Sanchez saw Dr. Robert M. Gross at the orthopedic clinic at OLMMC reporting joint pain in both knees and ankles, left shoulder, elbow and wrist, which had existed for about seven years and worsened later in the day. Tr. at 137. She also reported neck pain and episodes of knee and ankle swelling. *Id.* Upon examination, Dr. Gross noted some limitation in Sanchez's shoulder in raising her arms above her head,

---

**2.** Sanchez testified that she also received physical therapy in Puerto Rico in 1984 from Dr. Roura for her right knee and right shoulder. Tr. at 32. However, she provided no documentation to support this assertion.

and swelling of her right knee. *Id.* Dr. Gross noted in his report possible rheumatoid arthritis, rule-out osteoarthritis. *Id.* Dr. Gross ordered x-rays and lab tests to be taken. *Id.*

On April 6, 1992, x-rays were performed which revealed degeneration of the right knee, but no joint effusion, fracture or dislocation. Tr. at 151. The radiologist, Dr. Jonathan Davis, noted on his report moderate osteophyte formation arising from the medial and lateral tibial spines, and sclerosis and joint space narrowing involving the medial aspect of the femoral tibial joint space. *Id.* Sanchez's shoulder was also x-rayed and diagnosed as normal. *Id.*

On April 9, 1992, Sanchez again went to the orthopedic clinic at OLMMC complaining of dizziness and sharp upper chest pain radiating to her arm and back. Tr. at 139. Dr. Gross sent her to the emergency room and also referred her to the rheumatology clinic. *Id.* In the emergency room, Dr. Jakone treated Sanchez and reported, as his initial clinical impression, atypical chest pain and dizziness. Tr. at 132. X-rays of her chest were normal for her age. Tr. at 149. Lab tests results were negative for rheumatoid factor and positive for anti-nuclear antibodies ("ANA").[3] Tr. at 125. Sanchez was found to have a sedimentation rate of 22 mm/hr.[4] *Id.* Upon discharge the principal diagnosis was possible iron deficiency anemia. Tr. at 133. Sanchez was instructed to make an appointment with the gynecology clinic and to report to the medical clinic for a follow-up. Tr. at 133.

On August 7, 1992, Sanchez reported to the medical clinic at OLMMC for her follow-up visit. The notes refer to several medical conditions and different clinics, but it is unclear whether they are summarizing past treatments or recommending future treatment. Tr. at 140–41.

On October 23, 1992, Sanchez was described by the attending physician at the OLMMC medical clinic as having a history of hypertension, although she was not on any medication for that condition, and vague pain throughout her body. Tr. at 141. Sanchez was instructed to make an appointment with the gynecology clinic and to return after one month. *Id.*

On November 20, 1992, Sanchez was seen at the OLMMC medical clinic for complaints of chest pain and weakness. Tr. at 123. The attending physician diagnosed her with arthritis and generalized weakness. Tr. at 124. She was told by the doctor to follow-up at the arthritis clinic and to continue taking Motrin for the pain. *Id.* A profile of tests including one for rheumatoid factor were ordered. *Id.*

On January 29, 1993, Sanchez slipped and fell on her right knee while waiting for a clinic appointment at OLMMC. Tr. at 155. Dr. Torrie examined her, finding slight swelling in the right knee and some ankle pain. *Id.* An x-ray was ordered, and the results were normal. Tr. at 148.[5]

After missing appointments at several clinics, Sanchez visited Dr. Fomberstein at the rheumatology clinic at OLMMC on February 12, 1993. Tr. at 142–43. She complained of multiple joint pain over the previous eight years with episodic worsening of the large joints, including swelling and restriction in movement. *Id.* After examining her, the doctor noted crepitus in the joints of her wrists, elbows, knees, ankles and shoulders. Tr. at 143. He also noted joint line tenderness, but no swelling or redness, and that Sanchez had a full range of motion, although there was pain during that range of movement. *Id.* Dr. Fomberstein noted his initial impressions that Sanchez suffered from polyarthritis—osteoarthritis. *Id.* He prescribed Disalcid and recommended that she take extra strength Tylenol. *Id.* He also indicated that she should follow up in the arthritis clinic in one month and that the lab tests should be repeated.

On March 12, 1993, Sanchez again visited Dr. Fomberstein at the OLMMC rheumatol-

---

3. The normal result for both tests is negative.

4. The normal range is between zero and twenty mm/hr.

5. A nurse's note dated February 11, 1993 reported that Sanchez was encouraged to use heat for temporary relief of pain, to dress warmly on cold, damp days, and to do range of movement exercise daily to prevent stiffness. Tr. at 145.

ogy clinic and reported pain in both wrists, knees, ankles, and her left shoulder. Tr. at 146. The progress report listed a history of polyarthritis—osteoarthritis, and a fall and right ankle sprain a month earlier; however, there was no current swelling or pain. *Id.* Dr. Fomberstein characterized the examination as "unremarkable" and stated his impression that 'Sanchez had mild osteoarthritis. *Id.* He prescribed Disalcid and recommended that she take extra strength Tylenol. *Id.* He also recommended weight loss and "reassurance." Lab tests results were received a few days later which were similar to those of the earlier test: Sanchez's ANA test was positive, and her sedimentation rate was 21 mm/hr. Tr. at 129.

On April 6, 1993, Sanchez visited Dr. Edgar Baraya complaining of generalized joint and knee pain.[6] Tr. at 165. Dr. Baraya diagnosed her as suffering from rheumatic fever and rheumatoid arthritis. *Id.* He prescribed Trilisate and gave her an injection of Depo–Medrol.[7] *Id.*

After the examination, Dr. Baraya completed a form provided by Sanchez's attorney which evaluated Sanchez's functional capacity, including whether she could work and her degree of disability. Tr. at 165–67. On the form, Dr. Baraya indicated that Sanchez was permanently disabled and could not return to her previous work or any other type of work. Tr. at 165. This conclusion was based on his observation that, at the time of the examination, Sanchez had severe tenderness in her shoulders, hands, and knees, and had lumbar pain on flexion. *Id.*

In evaluating Sanchez's functional capacity, Dr. Baraya assessed the patient's capacity in terms of sustained daily work activity in a normal work environment. Tr. at 166. He indicated on the form by check-marks that Sanchez could not sit, stand or walk for more than two hours in an eight hour day; could occasionally lift up to ten pounds, carry up to five pounds, or bend, but she could never climb steps or reach; and was not capable of grasping, pushing, pulling, or fine manipulations with any of her hands or legs. *Id.* Dr. Baraya also noted that Sanchez could not work around moving machinery, in unprotected heights, or in an environment with significant temperature and humidity fluctuations. Tr. at 167. Additionally, he noted that Sanchez suffered from drowsiness and nausea as side-effects of medications. *Id.*[8]

On September 19, 1991, October 3, 1991, and July 14, 1992, Sanchez applied for social security disability benefits, supplemental security income benefits, and widow's insurance benefits, respectively. Tr. at 44–51, 53–69. In support of these applications, Sanchez alleged disability due to arthritis, allergies, headaches and anemia beginning in December 1985. *Id.* On November 6, 1991, Sanchez's claims were denied. Tr. at 70. On August 11, 1992, Sanchez's claims were denied on reconsideration. Tr. at 14. Sanchez then filed a timely request for an administrative hearing. Tr. at 74–79.

On May 25, 1993, a hearing was held before Administrative Law Judge ("ALJ") Louis V. Zamora. Sanchez was represented by counsel, and a Spanish interpreter was present for questioning. Tr. at 27. Numerous medical reports were submitted at the hearing recounting the treatment and evaluations described above. Tr. at 28. Sanchez testified that she suffered from leg weakness, pain in her arm and neck, lack of strength in the hands, and migraine headaches which occur three times a week and last for two to three hours. Tr. at 35–36, 38. She also testified to significant limitations on her abili-

---

**6.** Sanchez testified at the administrative hearing that she had seen Dr. Baraya twice. Tr. at 37. The record only contains a report from her first visit on April 6, 1993.

**7.** Sanchez notes in her brief that Depo–Medrol is indicated as an adjunctive therapy for short-term administration in synovitis of osteoarthritis; rheumatoid disorders; acute and subacute bursitis; acute gouty arthritis; epicondylitis; ankylosing spondylitis; acute non-specific tenosynovitis; and post-traumatic osteoarthritis. *See* Memoran-

dum Of Law On Behalf of The Plaintiff ("Pltf's Memorandum") at 8, n. 6, *citing Phys. Desk Ref.,* 48th Ed.1994, p. 2412.

**8.** Sanchez also submitted two handwritten notes, dated December 2, 1993, from Dr. Nair. Tr. at 174–74. These notes indicated that Sanchez had been treated at that time for "mild mitral stenosis and early congestive heart failure." *Id.* at 174. They went on to say that "patient needs close follow up in clinic and is advised not to exert too much." *Id.*

ty to work due to pain and weakness in her hips, legs and hands. Tr. at 38, 42. Specifically, Sanchez testified that she had no strength in her legs and suffered from constant pain in her neck and arms. Tr. at 35–36. Sanchez also stated that because of severe pain due to arthritis in her hips and legs, she cannot sit or stand for more than an hour. Tr. at 42. Additionally, Sanchez testified that she could not dress herself and had trouble with household chores because she could not raise her arms above her head. Tr. at 40. Sanchez also reported that she was prone to falling due to a lack of strength in her knees, primarily her right knee. Tr. at 30–31. Sanchez indicated that she walks to and attends church on Sundays, which is located near where she lives. Tr. at 39. The ALJ kept the record open for submission or records from Lincoln Hospital; however, none were received.

On March 11, 1994, the ALJ issued a decision finding that Sanchez was not disabled within the meaning of the Social Security Act and was therefore not entitled to benefits under any of her applications. Tr. at 14–19. Specifically, the ALJ found that Sanchez had generalized joint pain and mild mitral stenosis, but not equal or equivalent to those impairments listed in Appendix 1, Subpart P, Regulation No. 4. *Id.* at 18. He also found that her allegations of pain were "grossly inconsistent with the clinical record and the course of her treatment." *Id.* As a result, the ALJ concluded that Sanchez's medical condition only precluded her from heavy lifting and carrying, and thus she could return to her previous employment. *Id.* at 19.

In reaching these conclusions, the ALJ rejected Sanchez's assertion that Dr. Baraya was a treating physician. Tr. at 18. The ALJ stated "Dr. Baraya was not the 'treating physician.' At the time of his report he saw the claimant on one occasion." *Id.*

On April 27, 1994, Sanchez filed for a review of the ALJ's decision, which was denied by the Social Security Administration's Appeals Council on June 29, 1994. Tr. at 3–4.

On August 5, 1994, Sanchez filed the instant action arguing that she became disabled and unable to work due to generalized joint pain and mitral stenosis in December 1985, and that the ALJ's decision denying her benefits under social security disability, supplemental security income, and widow's insurance was arbitrary and capricious, contrary to the law and the provisions in the Social Security Act, and not based upon substantial evidence. Pursuant to Federal Rule of Civil Procedure 12(c), the parties cross-move for judgment on the pleadings.

## DISCUSSION

■ The findings of the Commissioner as to any fact, if supported by substantial evidence, are conclusive. *See* 42 U.S.C. § 405(g) (1991); *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971); *Rutherford v. Schweiker,* 685 F.2d 60, 62 (2d Cir.1982); *see also Rivera v. Harris,* 623 F.2d 212, 216 (2d Cir.1980). Substantial evidence has been defined as " 'more that a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Richardson,* 402 U.S. at 401, 91 S.Ct. at 1427, *quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938). If a court finds that there is substantial evidence supporting the Commissioner's decision, the decision must be upheld, even if there is also substantial evidence for the plaintiff's position. *See Alston v. Sullivan,* 904 F.2d 122, 126 (2d Cir.1990).

■ In order to be found disabled, a claimant must be unable to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. *See* 42 U.S.C. § 423(d)(1) (1991); 20 C.F.R. § 404.1527 (1996). The Second Circuit has summarized the Commissioner's five-step sequential evaluation process for evaluating disability claims as follows:

First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers wheth-

er the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir.1982); *see also* 20 C.F.R. § 404.1520. The claimant bears the burden of proof as to the first four steps. If the claimant establishes that he or she is unable to perform his or her past relevant work, the Commissioner bears the burden as to determining the claimant's ability to perform other work available in the national economy. *See Berry*, 675 F.2d at 467.[9]

Under the Commissioner's regulations, which modified the prior treating physician rule, the Commissioner evaluates every medical opinion it receives, regardless of its source. *See* 20 C.F.R. § 404.1527(d); *see also Schisler v. Sullivan*, 3 F.3d 563 (2d Cir.1993) (upholding the Commissioner's regulations which modified the prior "treating physician rule" for adjudicating disability claims). In determining what weight to give an opinion, the Commissioner considers such factors as the examining relationship, the treatment relationship—including length of treatment and frequency of the examinations, the supportability of the opinion by other relevant evidence, the consistency of the opinion with the record as a whole, and whether the doctor is a specialist. *See* 20 C.F.R. § 404.1527(d). If the Commissioner finds that a treating source's opinion on the issue of the nature and severity of an impairment is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the case record, the Commissioner will give it controlling weight. *See* 20 C.F.R. § 404.1527(d)(2).

In addition, the Commissioner will consider statements about a claimant's pain or other symptoms, but they alone will not establish that the claimant is disabled. There must be medical signs and laboratory findings which show that the claimant has a medical impairment which could "reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all of the other evidence ... would lead to a conclusion that [the claimant is] disabled." 20 C.F.R. § 404.1529(a) (1996). The Commissioner is responsible for making the ultimate determination or decision about whether the claimant meets the statutory definition of disability. *See* 20 C.F.R. § 404.1527(e)(1).

■ In this case, the ALJ's decision that Sanchez's impairments do not prevent her from performing her past relevant work is overwhelmingly supported by substantial evidence. As the ALJ noted, Sanchez's physical examinations at OLMMC showed essentially no significant abnormalities: on April 2, 1992, Sanchez showed normal range of motion of the leg and some limitation in raising the arms above the head; in February 1993, she showed no swelling, redness, restriction of the range of motion or positive straight leg raising; and on March 2, 1993, her examina-

9. Each of the three types of benefits for which Sanchez applied has its own nondisability requirements. To be eligible for social security disability insurance benefits, Sanchez would have had to become disabled on or before her insured status expired, December 31, 1988. Tr. at 87 ("DIS DLI 12/88"). To be eligible for supplemental security income benefits, Sanchez would have had to become disabled before the date of the Commissioner's decision, March 11, 1994. To be eligible for widow's insurance benefits, Sanchez would have had to become disabled within seven years after her husband's death, *i.e.* before October 24, 1994.

tion was noted as "unremarkable." [10] Furthermore, x-rays of the knees, taken in January 1993, showed no abnormalities; x-rays of the left shoulder were negative; and a chest x-ray was normal.

Nor is Sanchez's claim of disability consistent with the course of treatment prescribed during her many visits to OLMMC. With the exception of the Dr. Baraya's treatment, and two prescriptions for Disalcid, Sanchez was routinely advised to take general over-the-counter medications such as Motrin, Ibuprofen, and Tylenol. She was also advised to use heat for temporary relief, dress warmly on cold, damp days, to do range of movement exercises daily to prevent stiffness, and to lose weight.[11]

Sanchez argues that the ALJ failed to properly weigh Dr. Baraya's opinion.[12] However, the ALJ provided detailed reasons for discounting Dr. Baraya's diagnosis of general rheumatoid arthritis and rheumatic fever with severe tenderness in multiple joints. As the ALJ noted, Dr. Baraya's diagnosis was grossly inconsistent with the remainder of the medical record. Indeed, Dr. Fomberstein, who examined Sanchez twice during the prior two months, concluded that Sanchez suffered from only polyarthritis—osteoarthritis, and that she had a full range of motion in her joints, but with some pain. At the time Dr. Baraya completed his report, he had examined Sanchez only once. Moreover, the record reflected, and counsel conceded at Oral Argument, that Dr. Baraya completed his report on a form prepared and handed to him by Sanchez's attorney. Furthermore, Dr. Baraya failed to support his diagnosis by citing to any clinical findings. Nor did his prescribed treatment correspond with his diagnosis of a severe and disabling impairment.[13]

The Court also rejects Sanchez's argument that the ALJ failed to properly consider her allegations of pain. The ALJ specifically considered and rejected her allegations, noting that they are inconsistent with the clinical records and with her course of treatment by numerous physicians. *See Rivera v. Schweiker* 717 F.2d 719, 724 (2d Cir.1983) ("although it is clearly permissible for an administrative law judge to evaluate the credibility of an individual's allegations of pain, this independent judgment should be arrived at in light of all the evidence regarding the extent of the pain"). Indeed, Sanchez's routine treatments generally included over-the-counter medications, recommended weight loss, and "reassurance." The ALJ further noted that Sanchez has never been hospitalized or otherwise received intensive treatment for her alleged pain.[14] In addition, Sanchez's failure to attend numerous appointments supports the rational inference that she did not consider her pain so severe. This is especially true since, during the five-year period from when Sanchez stopped work in Puerto Rico in 1985 until she sought treatment at OLMMC in 1991, Sanchez approached only one doctor on one occasion

---

**10.** In her brief, Sanchez challenges the ALJ's characterization of the March 2, 1993 examination as "unremarkable." *See* Pltf's Memorandum at 15. However, the record demonstrates that Dr. Fomberstein wrote this remark on his report after he completed Sanchez's examination. Tr. at 146 ("PE [physical examination] unremarkable").

**11.** The Commissioner indicates in her brief that the usual dosage prescribed for Disalcid is 3000 mg daily taken in divided doses, whereas Sanchez was told to take two 500 mg tablets twice a day for a daily total of only 2000 mg. *See* Defendant's Memorandum Of Law In Opposition To Plaintiff's Motion For Judgment On The Pleadings And In Support of Defendant's Cross Motion for Judgment On The Pleadings ("Defendant's Memorandum") at 16, *citing* Physicians' Desk Reference 1311 (46th Ed.1992) and Tr. at 143.

**12.** The ALJ states: "Dr. Baraya was not the 'treating physician.' At the time of his report he saw the claimant on only one occasion." Tr. at 18. This conclusion was based on three prior paragraphs where the ALJ had set forth his reasons for discounting Dr. Baraya's opinion.

**13.** According to Sanchez's brief, the presence of anti-nuclear antibodies and elevated sedimentation rates are both possible indications of rheumatoid arthritis. *See* Pltf's Brief at 5 nn. 4, 5, 13. However, Dr. Fomberstein, based on the same clinical evidence, concluded that Sanchez suffers from nothing more that mild osteoarthritis.

**14.** The ALJ further noted that while Sanchez claimed to have undergone physical therapy in Puerto Rico, she presented no evidence supporting that claim.

regarding her pain. That doctor diagnosed her as suffering from a cervical strain and allergic rhinitis.[15]

In sum, while Sanchez established that she suffered from general joint pain and mild mitral stenosis, she failed to establish that she has a listed impairment, or combination of impairments medically equivalent to a listed impairment, which prevents her from returning to her past relevant work as a textile machine operator or tailor. The Court concludes that the ALJ's decision denying Sanchez's applications for widow's insurance benefits, social security disability benefits, and supplemental security income benefits is supported by substantial evidence.

## CONCLUSION

For the reasons set forth above, Sanchez's motion for judgment on the pleadings is denied, and the Commissioner's motion for judgment on the pleadings is granted. The Clerk of Court is directed to enter judgment accordingly and to close the above-captioned action.

It is **SO ORDERED.**

---

15. Indeed, the ALJ also considered Sanchez's allegation of headaches, but noted that the record does not show any condition or medical evidence which supports her allegation.