Laurence E. SAND, Plaintiff,

v.

Donna E. SHALALA,[1] Secretary of
Health and Human Services,
Defendant.

Civ. A. No. 92–1065–FGT.

United States District Court,
D. Kansas.

April 16, 1993.

---

1. Donna E. Shalala succeeded Louis W. Sullivan as Secretary of Health and Human Services on January 21, 1993. Pursuant to Fed.R.Civ.P. 25(d)(1), she is automatically substituted as defendant.

Patrick H. Thompson, Blevins & Thompson, Salina, KS, for plaintiff.

Stephen K. Lester, Office of U.S. Atty., Wichita, KS, for defendant.

### MEMORANDUM AND ORDER

THEIS, District Judge.

This matter is before the court on the plaintiff's motion for an order reversing the Secretary's decision (Doc. 7) and the defendant's motion to affirm decision of the Secretary (Doc. 9). This is a proceeding under Title II of the Social Security Act, 42 U.S.C. §§ 401 et seq.

Plaintiff filed an application for disability benefits under Title II. Tr. 174–77. The claim was denied initially and on reconsideration. Tr. 178–79, 182. On August 26, 1988, following a hearing, an administrative law judge (ALJ) found the plaintiff was not under a "disability" as defined in the Social Security Act. Tr. 53–59. On December 8, 1988, the Appeals Council of the Social Security Administration granted plaintiff's request for review, vacated the hearing decision, and remanded the case for further proceedings, including a new decision. Tr. 47–49. On July 22, 1989, an ALJ issued a decision finding plaintiff not disabled. Tr. 28–35. On March 21, 1990, the Appeals Council granted plaintiff's request for review, vacated the decision, and remanded the case to an ALJ for further proceedings, including a supplemental hearing and a new decision. Tr. 19–21. On January 25, 1991, following a second hearing, an ALJ found plaintiff was not under a disability. Tr. 8–13. On December 16, 1991, after considering additional evidence, the Appeals Council denied plaintiff's request for review. Tr. 4–5. Thus, the decision of the ALJ stands as the final decision of the Secretary.

The standard of review in this case is established by 42 U.S.C. § 405(g), which provides that "[t]he findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive...." Substantial evidence is that evidence which a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales,*

402 U.S. 389, 402, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971); *Fowler v. Bowen*, 876 F.2d 1451, 1453 (10th Cir.1989). It is not the duty of the court to reweigh the evidence, or substitute its decision for that of the ALJ. *Talbot v. Heckler*, 814 F.2d 1456, 1461 (10th Cir.1987). Substantial evidence, however, must be more than a mere scintilla. *Perales*, 402 U.S. at 403, 91 S.Ct. at 1428. This court's determination entails a review of "the record as a whole, and 'the substantiality of the evidence must take into account whatever in the record fairly detracts from its weight.'" *Talbot*, 814 F.2d at 1461. (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951)). In applying these standards, the court must keep in mind that the purpose of the Social Security Act is to ameliorate some of the rigors of life for those who are disabled or impoverished. *Dvorak v. Celebrezze*, 345 F.2d 894, 897 (10th Cir.1965).

For determining whether a Social Security claimant is disabled, the Secretary has developed a five step sequential evaluation. 20 C.F.R. § 404.1520; *Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir.1988). If a determination of disability can be made at any one step, consideration of any subsequent steps is unnecessary. The relevant inquiry at step one is whether the claimant is engaged in substantial gainful activity. If not, step two requires the factfinder to determine whether the claimant has a medically severe impairment or combination of impairments. *Bowen v. Yuckert*, 482 U.S. 137, 140, 107 S.Ct. 2287, 2291, 96 L.Ed.2d 119 (1987). If the claimant does not have a listed impairment, step three entails determining "whether the impairment is equivalent to one of a number of listed impairments that the Secretary acknowledges are so severe as to preclude substantial gainful activity." *Id.* If there is no such equivalency, the claimant must show at step four that the "impairment prevents the claimant from performing work he has performed in the past." *Id.* At the fifth step, the factfinder must determine whether the claimant has the residual functional capacity "to perform other work in the national economy in view of his age, education, and work experience." *Id.* The Secretary bears the burden of proof at step five. *Id.* 482 U.S. at

146 n. 5, 107 S.Ct. at 2294 n. 5; *Williams*, 844 F.2d at 751.

In his application for disability benefits plaintiff stated that he was born on October 29, 1934 and alleged disability beginning June 26, 1987 due to chronic back pain. Tr. 174. Treatment notes reflect complaints of back pain beginning in 1981 and continuing until the alleged onset date. Tr. 213–15, 217–21, 223–25, 227–28.

The plaintiff reportedly consulted with Dr. John Jarrott in 1979. X-rays at that time showed some degenerative spurring but nothing of significance otherwise. Tr. 269 (letter from Dr. Gregory Thomas dated 11/4/87).

Dr. Gregory Thomas, M.D., began treating the plaintiff for mid-thoracic back pain in April 1981. Dr. Thomas discontinued Xyloprim which plaintiff had been taking, placed plaintiff on Indocin, and referred plaintiff to Dr. Jarrott for an orthopedic evaluation. Tr. 223.

Dr. Jarrott saw plaintiff in May 1981. At that time, Dr. Jarrott advised plaintiff to do pushups, to rest on his back with his head forward at night, to use heat as he wished, and to take aspirin. Tr. 213. Dr. Jarrott saw plaintiff several additional times between 1981 and 1985. Dr. Jarrott prescribed other medications and cervical traction. Plaintiff reported that traction did not help. Plaintiff took Dolene for several years. Tr. 213–15.

Dr. Norman Bos, M.D., an orthopedic surgeon, treated plaintiff from December 1985 to April 1986. Tr. 217–20. During a December 2, 1985 examination, Dr. Bos diagnosed chronic cervicothoracic sprain with intermittent flare-ups, possibly related to stress on the nuchal ligament, but definitely associated with increased cervical lordosis; and probable chronic sprains involving the interspinous ligaments at about the T8, 9 and 10 levels, probably on a postural basis and related to cervical lordosis and dorsal kyphosis. Dr. Bos recommended an exercise regimen to strengthen the back muscles. At that initial visit, Dr. Bos advised plaintiff to minimize his intake of Dolene and to use Extra Strength Tylenol. Tr. 219. At a second office visit to Dr. Bos, plaintiff reported that Tylenol was

ineffective. Tr. 219. Notes from an April 1, 1986 office visit indicate that plaintiff had been taking Dolene three to four times a day. Plaintiff reported that Dolene was the only medication that had helped him. Plaintiff was advised that Dr. Bos suspected that plaintiff was habituated if not addicted to Dolene. Dr. Bos referred plaintiff back to Dr. Thomas with suggestion that plaintiff be prescribed a non-steroidal anti-inflammatory medication. Tr. 220.

Dr. Thomas continued to treat plaintiff in 1986 and 1987 for back pain. Dr. Thomas saw plaintiff again on April 14, 1986. He prescribed Motrin and Orudis at the recommendation of Dr. Bos. Plaintiff reported no relief from these new medications. Tr. 224. In October 1986, Dr. Thomas recommended the use of a TENS unit. Tr. 225.

In December 1986, plaintiff was referred by Dr. Thomas to Dr. Ely Bartal, M.D., an orthopedic surgeon. Plaintiff's neurological examination was normal and x-rays were unremarkable. Dr. Bartal diagnosed chronic back pain. Tr. 227–28. At Dr. Bartal's recommendation, a bone scan and MRI were performed in December 1986. The bone scan was normal. The MRI revealed degenerative changes of the lower lumbar discs with posterior hypertrophy and a "relative mild stenosis" at the L4–5 level. Tr. 231–32.

Outpatient treatment notes indicate that plaintiff underwent physical therapy at McPherson Memorial Hospital during the early part of 1987. Tr. 234–37. Plaintiff was using a TENS unit, and reported that he began using it in October 1986. Tr. 234.

In a pain questionnaire dated July 14, 1987, plaintiff reported taking twelve aspirin per day. Tr. 193–94. Plaintiff reported that his daily activities including riding a bike, walking, doing back exercises, lying down, mowing the lawn, and occasionally going fishing. *Id.* In August 1987, plaintiff reported to his physicians that he took between nine and twelve aspirin per day. Tr. 241, 243.

In August 1987 plaintiff was examined by Dr. Ali Manguoglu, M.D., primarily regarding a work-related elbow injury. Regarding plaintiff's back pain, Dr. Manguoglu diagnosed chronic thoracic pain and cervical pain,

most likely related to degenerative osteoarthritis. Dr. Manguoglu suggested trying an epidural injection for plaintiff's back pain. However, Dr. Manguoglu was not optimistic about the potential of a solution to the problem and recommended that plaintiff continue to try to learn to live with it. Tr. 241–42. Plaintiff did have a steroid epidural injection performed on August 18, 1987, Tr. 249–50, but reported no relief. Tr. 246.

In a letter dated November 4, 1987, Dr. Thomas stated that plaintiff "has had intrascapular back pain that has defied specific diagnosis and more importantly specific treatment since approximately 1977." Dr. Thomas further stated that plaintiff obtains relief only if he stays off his feet and does not have any prolonged activity. Dr. Thomas stated that as of May 1987, the plaintiff's pain had progressed to where he was unable to stand for prolonged enough periods to work. Tr. 269.

Plaintiff attended six biofeedback therapy sessions at Prairie View, Inc. in McPherson in 1987. Plaintiff experienced significant levels of relaxation, but did not experience any relief from his back pain. Dr. Larry Hays, Ph.D., stated that with regard to plaintiff's psychological abilities, plaintiff was able to understand oral instructions, work adequately under or independent of supervision and relate appropriately to coworkers and supervisors. Plaintiff's capacity to meet quality standards, productions norms, and to sustain adequate attendance was limited by his chronic back pain. Dr. Hays acknowledged that since he is not a physician, he was unable to estimate the extent of plaintiff's physical disability. Tr. 251.

Plaintiff was treated by Dr. John D. Martinez, M.D., a rheumatologist, from late 1987 through 1988. Office notes reflect that plaintiff reported seeing several different doctors who had been unable to diagnose his back problem. Plaintiff reported being treated by several chiropractors and physical therapists. Notes also reflect that plaintiff was prescribed anti-inflammatory medication but ended up on Darvon. Plaintiff advised that Dr. Bos discouraged the use of Darvon. The physical examination conducted by Dr. Martinez on November 4, 1987 was unremarka-

ble. Dr. Martinez felt unable to help him diagnostically. Dr. Martinez prescribed Salsalate and Amitriptyline. Tr. 281–82. A notation from March 29, 1988 states that plaintiff telephoned the office with a question regarding whether he would ever get over what he had. Dr. Martinez informed the plaintiff that he did not know what the plaintiff had and he did not know how long the plaintiff would have it. Tr. 283. At an October 20, 1988 office visit, Dr. Martinez suggested that plaintiff might benefit from a referral to a pain management clinic or to the Mayo Clinic. Tr. 284. In a letter dated December 1, 1988, Dr. Martinez stated that he was unable to locate a pain management program at any of the major hospitals in Wichita. Tr. 280.

Plaintiff was examined at the Mayo Clinic in Rochester, Minnesota on October 3, 1989. X-rays of the cervical, thoracic and lumbar spines were essentially within normal limits. A neurological examination was entirely normal. A physical medicine consultation indicated that plaintiff's problem appeared to be primarily one of tension myalgia. Orthopedic surgeon Miguel E. Cabanela, M.D. advised plaintiff that there was no surgical solution to his problem. Plaintiff was encouraged to continue taking Amitriptyline and to get on a program of exercises. Plaintiff was advised that it might be reasonable not to return to his previous occupation, since that seemed to aggravate his symptoms. Dr. Cabanela declined to express any opinion as to disability. Tr. 293–94.

Plaintiff was evaluated and treated at the Texas Back Institute in Plano, Texas beginning in October 1990. Dr. James D. Cable, M.D., examined plaintiff on October 22, 1990. Dr. Cable diagnosed thoracic syndrome with degenerative changes, possible facet syndrome; and cervical syndrome with degenerative changes. Tr. 311–12. Plaintiff was referred to Dr. Jerry Holubec, D.O., for thoracic facet injections. Tr. 314. An MRI performed on January 31, 1991 revealed a congenital "fusion" or non-segmentation of the C3–4. Tr. 316. Dr. Alexis P. Shelokov, M.D., began treating plaintiff on January 31, 1991. Dr. Shelokov noted that the MRI was unremarkable and that x-rays showed moderate degenerative disease in the thoracic spine. An injection into the intraspinous ligaments provided immediate relief. Dr. Shelokov diagnosed spinous process pain syndrome. Tr. 310. Because plaintiff continued to complain of pain, Dr. Shelokov referred him to Dr. Deborah Holubec, M.D., for additional injections. Plaintiff reported that the injection provided 50% relief which was short lived. Tr. 306–09, 313. Dr. Shelokov and Dr. Deborah Holubec agreed that plaintiff has a chronic ligamentous strain/sprain, but that there was nothing further they could do for him, as the previous injections did not provide relief. Tr. 306–08.

Plaintiff suffered an injury to his right elbow at work in 1986. Dr. Gary L. Harbin, M.D., rated the plaintiff at a 5% disability to the upper extremity. Plaintiff testified that he has difficulty gripping objects with his right hand and picking up heavy objects with his right hand and arm. Plaintiff further testified that he must perform tasks such as opening jars with his left hand. Tr. 94–95, 144–45.

At the administrative hearing held on April 19, 1988, the plaintiff testified that he quit working in June of 1987 because he could not tolerate the pain during the day's work. Tr. 73. Plaintiff complained of neck and back pain for which he took Salsalate, Amitriptyline, and Darvon or Dolene. Tr. 75–76. Plaintiff testified that he wore a TENS unit which was prescribed in early 1987. Tr. 79. Plaintiff stated that his physicians had not limited his ability to lift. Tr. 80. He testified that at his previous job, he occasionally lifted fifty pounds. Tr. 74. Plaintiff testified that he enjoyed hunting and fishing, and that he still engaged in these activities, although not as frequently or for as long. Tr. 83–84. Plaintiff also worked in his garden. Tr. 84–85. Plaintiff estimated that he could stand at a counter for three to four hours and could sit at a desk for two to three hours. After that, he would have to lie down for an hour to an hour and a half. Tr. 85–86.

At the second hearing held on September 25, 1990, plaintiff testified that his pain was located in his back and neck. Tr. 118. Plaintiff reported that the pain began in 1977. Plaintiff has not required surgery,

hospitalization, a back brace, cane, or crutch. Tr. 119. The most recent treatment plaintiff had sought for his back pain was a visit to the Mayo Clinic in October 1989. Plaintiff was receiving no medical treatment at the time of the hearing. Tr. 121. Plaintiff also testified that his right elbow hurt when he moved it, a result of an accident at work. Tr. 144. Plaintiff testified that he was taking Salsalate, an anti-inflammatory, and Amitriptyline to help him sleep. Tr. 120. Plaintiff testified that his pain increased with stress and that he did not experience neck pain every day. Tr. 143, 147.

Plaintiff described his daily activities as follows. He performs daily back exercises. Tr. 118, 121–22. Plaintiff lays down for two to three hours per afternoon but does not sleep. Tr. 123. Plaintiff reads two hours a day. Tr. 128. Plaintiff works in his garden approximately 45 minutes to an hour per day. Tr. 131. Plaintiff uses a riding mower to mow the lawn, which takes two days. Tr. 130. Plaintiff attends church approximately three times a month. Tr. 137. Plaintiff does some laundry and vacuuming. Tr. 136. Plaintiff estimated that he had gone raccoon hunting thirty times and fishing twenty times in the past year. Tr. 128–29. Plaintiff testified that he could only hunt for about an hour at a time and that someone else handles the dogs, carries the rifle and does the shooting. Tr. 129. Plaintiff testified that he could fish for only about two hours at a time. Tr. 145. He also changes the oil and spark plugs in his vehicles. Tr. 133.

Plaintiff testified that he walks one mile per day and he estimated that he could lift 50 pounds, but not repetitively. Tr. 122. Plaintiff later testified that he could only lift 30 to 35 pounds. Tr. 140. He thought that he could sit for three hours and stand for one hour. Tr. 137–38. Plaintiff has difficulty working with his hands in front of him, stooping, leaning forward, and working overhead. Tr. 141.

Plaintiff testified that in 1977 he began to experience pain in his back and neck when he was tired or under stress. Tr. 90–91, 119. Plaintiff reported no specific injury which caused the onset of this pain. Tr. 217. Plaintiff testified that the pain is located in two areas. Plaintiff described a wringing sensation in the middle of his back below the shoulder blades and a burning pain at the base of his neck. Tr. 77, 89–90, 118–19. The burning sensation in his neck may also radiate out to his left shoulder. Tr. 125. Plaintiff also testified that he has had problems with his lower back for many years. He performs a series of daily exercises to strengthen his lower back. Tr. 90, 118, 121–22.

Plaintiff testified that he experiences the wringing pain in his back about two or three hours after rising in the morning and the pain occurs whether or not he is active. He testified that the pain increases in intensity depending upon his level of physical activity. Plaintiff rated the pain a level of 7 on a scale from 1 to 10. Tr. 77, 139–40. Plaintiff testified that he receives relief from his back pain by lying down for two to three hours every afternoon. Tr. 123. Thereafter, his physical stamina is lessened and he can only work for 30 minutes to an hour before having to lie down again. Tr. 78, 141–42. Plaintiff further testified that his back pain is aggravated by stress and by cold weather. Tr. 91, 93. He testified that his pain is increased whenever he does work with his hands in front of himself, does work overhead, stoops, or bends forward. Tr. 138–39, 141.

Plaintiff has a high school education and has received no other schooling or training. Tr. 116. Plaintiff worked in maintenance for Sterling Drug for approximately ten years and left this work on June 29, 1987. Plaintiff repaired the filling and packaging machinery and also performed some production work. Tr. 116–17. Plaintiff's past work history consists of jobs in the maintenance and machinery repair fields. Plaintiff's previous work involved the use of small hand and power tools. Tr. 117.

Vocational expert James T. Molski testified that plaintiff possessed transferable skills from his maintenance mechanic job which included: knowledge of mechanical concepts and processes, the ability to use hand and power tools, welding experience, experience following complex written or diagrammatic instructions to repair equipment, potential knowledge of building codes, expe-

rience inspecting machinery and mechanical equipment for defects, experience measuring and cutting materials, experience replacing wiring and fixtures, and experience setting up and operating machines. Tr. 151–54.

Mr. Molski testified in response to a hypothetical question which assumed plaintiff's age, education, work experience, and the transferable skills previously identified. Tr. 154. The hypothetical additionally assumed an individual who could lift fifty pounds occasionally and twenty-five pounds frequently, and who could stand and walk at least four hours and sit at least four hours of an eight hour workday. The individual could not do an excessive amount of bending. Tr. 154. Molski testified that such an individual could not perform his past work in maintenance, which is typically heavy work. Tr. 155.

Mr. Molski testified that plaintiff's skills would transfer to the following light or sedentary skilled or semi-skilled jobs: precision assembler, of which there are 350,000 in the nation and 1200 in Kansas; assembly inspector, of which there are 250,000 in the nation and 3500 in Kansas; tool crib attendant, of which there are 250,000 in the nation and 800 in Kansas; coil winder, of which there are 40,000 in the nation and 350 in Kansas; electrical control assembler, of which there are 150,000 in the nation and 1300 in Kansas; or electronics assembler, of which there are 260,000 in the nation and 500 in Kansas. Tr. 156–62.

When questioned by plaintiff's attorney, Mr. Molski reiterated that plaintiff had transferable skills which included a knowledge of tools that is learned through experience. By stating that knowledge of tools was a transferable skill, Molski testified that he meant that the person performing the work had knowledge of the proper tools to use in the proper setting. Molski indicated that such a skill could be learned on the job. Tr. 168. Plaintiff testified that while blueprints and schematics were available at his previous job, plaintiff usually repaired machinery without reference to them. Tr. 169–70.

In his decision, the ALJ made the following findings:

1. The claimant has not performed substantial gainful activity since his alleged date of onset of disability.

2. The claimant meet [sic] the special earnings requirements for Title II disability insurance benefits on his alleged date of disability onset and continues to meet said requirements through at least the date of this decision.

3. The claimant has a history of chronic back strain.

4. The claimant [sic] complaints of pain are exaggerated and not credible.

5. The claimant retains the residual functional capacity to perform medium jobs not requiring repetitive bending.

6. The claimant cannot perform his past relevant job because it required repetitive bending.

7. The claimant is 56 years old and is of "advanced age."

8. The claimant has a high school education.

9. The claimant has worked as a maintenance mechanic which is a skilled position. He has acquired a number of transferable skills including the ability to weld, knowledge of tools and equipment and knowledge of building codes and requirements.

10. Considering the claimant's age, education, vocational background, maximum sustained work capacity and nonexertional limitations, he retains the ability to perform the jobs of coil winder, precision assembler, tool crib attendant, final assembly inspector and mold machine operator. These jobs exist in significant numbers in the national economy and in the area which the claimant resides.

While the claimant cannot perform his past relevant work, there are significant numbers of other jobs existing in the national economy which he can perform given his vocational profile and combined limitations and Regulation 404.-1520(f) requires that he be found "not disabled."

Tr. 12–13. The first four steps of the sequential evaluation are not at issue. The ALJ made the determination of not disabled

at the fifth step, where the Secretary bears the burden of proof.

Plaintiff contends that the record does not support the following findings of the Secretary: (1) that plaintiff's complaints of pain are exaggerated and are not credible; (2) that the plaintiff retains the residual functional capacity to perform medium jobs not requiring repetitive bending and, specifically, that the plaintiff retains the ability to perform the jobs of coil winder, precision assembler, tool crib attendant, final assembly inspector and mold machine operator; and (3) the plaintiff has acquired a number of transferable skills including the ability to weld, knowledge of tools and equipment, and knowledge of building codes and requirements.

### 1. Allegations of Pain

█] Pain can be a disabling condition under Title II of the Social Security Act. The following procedure is used for analyzing allegations of pain:

> If a pain-producing impairment is demonstrated by objective medical evidence, the decision maker must consider the relationship between the impairment and the pain alleged. "[T]he impairment or abnormality must be one which 'could reasonably be expected to produce' the *alleged* pain." At this stage, the decision maker takes the subjective allegations of pain as true in determining whether they are reasonably related to the proven impairment. He does not evaluate the claimant's credibility. If the nexus between impairment and pain alleged is insufficient, the claimant cannot receive benefits based on disabling pain. If an appropriate nexus does exist, the decision maker must then consider all the evidence presented to determine whether the claimant's pain is in fact disabling. This evidence includes the medical data previously presented, any other objective indications of the degree of the pain, and subjective accounts of the severity of the claimant's pain. Only at this point may the decision maker decide whether he believes the claimant's assertions of pain.

*Luna v. Bowen*, 834 F.2d 161, 163 (10th Cir.1987) (citations omitted).

The first step requires only a loose nexus between the alleged pain and the medical evidence. "Accordingly, if an impairment is reasonably expected to produce *some* pain, allegations of *disabling* pain emanating from that impairment are sufficiently consistent to require consideration of all relevant evidence." *Id.* at 164. In the present case, the plaintiff has a medically diagnosed condition that can reasonably be expected to produce pain. The ALJ did not specifically find that the requisite nexus existed, but considered the factors applicable to the second step of the analysis.

█ At the second step, the ALJ is to consider several factors, including the claimant's credibility, persistent attempts to find relief, willingness to try any treatment prescribed, regular contact with physicians, daily activities, medication, and psychological disorders. *Id.* at 165–66. The ALJ may consider a number of factors in determining the credibility of pain testimony, including: the levels of medication and their effectiveness, the extensiveness of the attempts (both medical and nonmedical) to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility, the motivation of and relationship between the claimant and other witnesses, and the consistency of the nonmedical testimony with the objective medical evidence. *Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir.1988) (citing *Luna v. Bowen*, 834 F.2d at 165–66). Regarding the use of pain medications and the nature of the medical contacts, several matters must be kept in mind. Some claimants find the side effects of pain medication to offset its benefits, others find little relief from pain medication, and others cannot afford prescription medications. Some claimants who are disabled by pain may be unable to afford medical treatment or may have resisted medical help out of pride, fear, or other valid reasons. *See Huston*, 838 F.2d at 1133 n. 7.

█ In the present case, the ALJ made a specific finding that plaintiff's complaints of pain were not credible. The ALJ gave several reasons for this finding. The ALJ noted that repeated clinical evaluations of the plain-

tiff have failed to disclose neurological deficits, muscle atrophy, or muscle spasms. The ALJ found that there was little connection between the objective medical evidence and the plaintiff's subjective complaints. The ALJ stated that the plaintiff had had "virtually no treatment" for his back problems in the previous few years. Plaintiff has had no hospitalizations or surgery. Plaintiff's medical treatment has been conservative. Plaintiff does not take strong prescriptive pain medication. The ALJ stated that none of plaintiff's treating physicians have suggested that he is disabled. The plaintiff uses no crutch or cane for ambulation and wears no back brace or other supportive device. The ALJ found that plaintiff's many daily activities were inconsistent with his subjective allegations of severe pain. The ALJ noted the plaintiff's testimony regarding performing yard work and mowing the lawn, helping with cooking and housework, daily gardening, automobile maintenance, and hunting and fishing. The ALJ also stated that the plaintiff's own testimony at the hearing suggested that he could handle many of the sedentary, light and medium jobs identified by the vocational expert. Tr. 11. The ALJ further noted that plaintiff had no outward signs of chronic pain or ill health. Tr. 12.

■ In assessing credibility, the ALJ must consider all evidence, both objective and subjective. *Hamilton v. Secretary of Health & Human Services,* 961 F.2d 1495, 1498 (10th Cir.1992). Credibility determinations are the province of the ALJ. *Id.* at 1499. However, in the present case, the ALJ failed to consider several factors relevant to the credibility analysis. Regarding plaintiff's complaints of disabling pain, the ALJ failed to consider the reasons for the frequency or infrequency of medical contacts, including perhaps financial inability to obtain medical care. The ALJ failed to address the documented problem with addiction to prescription pain medication. The ALJ failed to consider both the medical and nonmedical attempts to obtain relief, e.g., biofeedback, chiropractic, physical therapy, traction, use of a TENS unit, injections, and daily exercises. The ALJ did not address the fact that doctors have informed plaintiff that there is no surgical solution to his problem. The

ALJ also did not address the fact that a specific diagnosis has eluded various treating physicians. Previous attempts at treatment have been ineffective and no new course of treatment has been identified by plaintiff's treating physicians. The ALJ should also consider the fact that none of the treating physicians ever expressed doubt about the plaintiff's complaints of pain or accused him of malingering. On remand, the ALJ should consider these and any other relevant factors regarding the plaintiff's complaints of pain and the credibility thereof.

While plaintiff refers to his daily activities as sporadic diversions, the ALJ is entitled to consider the extent of plaintiff's daily activities in determining whether the plaintiff's complaints of pain are credible. *Huston v. Bowen,* 838 F.2d at 1132; *Luna v. Bowen,* 834 F.2d at 165–66.

Regarding the limited and conservative nature of medical treatment as found by the ALJ, the following should also be addressed on remand: (1) whether any treatment would restore the plaintiff's ability to work; (2) whether such treatment was prescribed; (3) whether the plaintiff refused any such treatment; and (4) if so, whether the refusal was without justifiable excuse. *See Frey v. Bowen,* 816 F.2d 508, 517 (10th Cir.1987).

Plaintiff contends that the ALJ disregarded the opinion of his treating physician. Plaintiff's treating physician, Dr. Thomas, stated in a letter that plaintiff was unable to stand for sufficient lengths of time to continue working. Tr. 269. An examination of the entire letter from Dr. Thomas does not reveal an opinion that the plaintiff is disabled by his pain. Dr. Thomas stated that plaintiff needed to "stay[ ] off his feet." The letter does support a determination that plaintiff is unable to return to his former work. Dr. Thomas did not, however, address whether the plaintiff would be capable of performing a more sedentary type of job. No other physician has rendered an opinion that plaintiff is disabled by his pain. Dr. Cabanela advised plaintiff that it might not be reasonable to return to his previous occupation since it appeared to aggravate his symptoms,

but declined to express any opinion as to whether plaintiff was disabled. Tr. 294.

### 2. Residual Functional Capacity

The ALJ found that plaintiff retained the residual functional capacity to perform medium jobs not requiring repetitive bending. Tr. 12. Residual functional capacity is "the maximum degree to which the individual retains the capacity for sustained performance of the physical-mental requirements of jobs." 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.-00(c). "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. § 404.1567(c).

Plaintiff argues that the ALJ failed to state the facts upon which the finding of medium residual functional capacity is based. The plaintiff takes issue with the hypothetical question presented to the vocational expert, which assumed the ability to lift 50 pounds occasionally and 25 pounds frequently, and the ability to stand and walk for four hours and sit for four hours in an eight hour day. Plaintiff argues that the hypothetical is flawed because it does not conform to the plaintiff's situation.

"[T]estimony elicited by hypothetical questions that do not relate with precision all of a claimant's impairments cannot constitute substantial evidence to support the Secretary's decision." *Hargis v. Sullivan,* 945 F.2d 1482, 1492 (10th Cir.1991). The ALJ erred by failing to relate plaintiff's arm and elbow impairment to the vocational expert in the hypothetical question.

Further, the factual support behind the medium residual functional capacity finding is not clear from the record and the ALJ failed to articulate it in his opinion. The ALJ did note the plaintiff's testimony that he could sit for three hours before changing position, lift 35 pounds occasionally and 10 pounds frequently, and stand for an hour. Tr. 11. At the first hearing, the plaintiff testified that he could stand for three to four hours and could sit for two to three hours. Tr. 85–86. Plaintiff also testified that no restrictions had been placed on his ability to lift. Tr. 80. At the second hearing, plaintiff

testified that he walks a mile a day. Tr. 122. The plaintiff testified that he could sit for three hours and stand for one hour. Tr. 137–38. The ALJ's hypothetical to the vocational expert assumed the ability to stand and walk for four hours and the ability to sit for four hours in an eight hour day. Those assumptions do not follow directly from the plaintiff's testimony. If the ALJ based his findings on a credibility determination, that should be so specified. On remand, the ALJ shall articulate the basis for the hypothetical involving the ability to stand, walk, sit and lift.

Plaintiff further argues that the ALJ failed to address the injury to his right arm. A review of the record reveals that the ALJ did not once refer to plaintiff's elbow injury in his decision. The impairment to plaintiff's right elbow and arm is documented in the record. The failure to consider all of the claimant's impairments in combination is error. The Secretary must consider the combined effects of impairments which may not be severe individually, but which in combination may constitute a severe medical disability. 42 U.S.C. § 423(d)(2)(B); *Hargis v. Sullivan,* 945 F.2d 1482, 1491 (10th Cir.1991); *see also Hawkins v. Heckler,* 600 F.Supp. 832, 837 (D.Kan.1985) (the Secretary is required to consider the claimant's impairments in combination). On remand, the ALJ shall consider the plaintiff's impairment to his right elbow and arm and the impact that impairment may have on the plaintiff's residual functional capacity and ability to work.

Plaintiff argues that he cannot perform the full range of work at any residual functional capacity level due to his need for lengthy rest periods and the limitations on his ability to sit or stand. Plaintiff testified regarding his pain and his need to change positions and to take rest periods. Plaintiff notes that the vocational experts testified that a requirement of rest periods of two to three hours would be inconsistent with work at any exertional level. The ALJ did not address the testimony regarding plaintiff's need for lengthy rest periods. On remand, the ALJ shall consider the plaintiff's alleged limitations on his ability to sit or stand and his need for lengthy rest periods in determin-

ing whether he is capable of performing any work. In order to engage in substantial gainful activity, a person must be capable of performing on a reasonably regular basis. The ability to work only sporadically or intermittently is not substantial gainful activity. *Byron v. Heckler,* 742 F.2d 1232, 1235 (10th Cir.1984).

The ALJ also shall consider plaintiff's testimony regarding the nonexertional nature of his pain. Plaintiff testified that the pain occurs regardless of his activity level. Tr. 139.

■ Under the Social Security regulations, the Secretary generally does not consider activities such as taking care of oneself, household tasks, hobbies, therapy, school attendance, club activities or social programs to equate with substantial gainful activity. 20 C.F.R. § 404.1572(c). While household activities may be considered, along with the medical evidence, in determining whether a claimant is disabled, they do not in themselves establish that a claimant is able to engage in substantial gainful activity. *Talbot v. Heckler,* 814 F.2d 1456, 1462–63 (10th Cir. 1987).

3. Transferable Skills.

■ Under the Social Security regulations, an individual is considered to have transferable skills "when the skilled or semi-skilled work activities [the individual] did in past work can be used to meet the requirements of skilled or semi-skilled work activities of other jobs or kinds of work." 20 C.F.R. § 404.1568(d)(1). Transferability is most probable among jobs in which the same or a lesser degree of skill is required; the same or similar tools or machines are used; and the same or similar raw materials, products, processes, or services are involved. *Id.* § 404.1568(d)(2). "Transferability refers to acquired work skills, not to aptitudes and attributes that are more properly characterized as qualities necessary and useful in nearly all jobs." *Frey v. Bowen,* 816 F.2d 508, 517–18 (10th Cir.1987).

Plaintiff argues that the transferable skills found by the Secretary, including ability to weld, knowledge of tools and equipment, and

knowledge of building codes, do not meet the definition of transferable skills. Plaintiff contends that knowledge of tools and equipment is an aptitude, not an acquired skill.

The vocational expert testified regarding the job duties of plaintiff's previous position of maintenance mechanic. The occupation involved general maintenance of machinery, general building maintenance, repair and adjustment of machinery, welding, and the use of hand and power tools. The occupation is defined as skilled. Tr. 151. Plaintiff does not appear to take issue with that assessment. The vocational expert also testified regarding the transferable skills plaintiff would have obtained in his previous work, including the knowledge of tools, the ability to weld, and potentially the knowledge of building codes. Tr. 151–53.

■ Plaintiff argues that the knowledge of tools and equipment is an aptitude, not a skill. When questioned by plaintiff's attorney regarding whether the use of tools is a skill, the vocational expert testified, "Well, it depends on the degree and what I was trying to indicate by indicating it was a transferra- ble [sic] skill was that person doing that kind of work typically would have to have more than know what a screwdriver is.... He'd have to know what tools to use in the proper setting." Tr. 168. When questioned regarding how that skill is acquired, the expert testified that it could be learned on the job in the course of employment, but was not something that could be picked up quickly. Tr. 168. The court agrees with plaintiff that the ability merely to pick up a screwdriver does not demonstrate any particular skill. However, the ability to use the proper tools properly in the repair of machinery does reflect a skill which the plaintiff possesses. Such a skill is not an aptitude common to most people. *E.g., Frey v. Bowen,* 816 F.2d at 518 (the skills found by the Secretary—understanding, common sense and logic—were not skills at all, but merely aptitudes or traits).

■ The vocational expert also testified regarding the occupations to which he believed the plaintiff's skills would transfer. Plaintiff takes issue with the lack of any finding that the same or similar tools, machines, materials, products, processes or ser-

vices are involved in any of the jobs the Secretary found plaintiff could do. The regulations do not require an exact match between prior work and work to which skills may transfer. 20 C.F.R. § 404.1568(d). The vocational expert briefly discussed the nature of each of the identified jobs and the duties and the types of skills involved. Tr. 155–62. The court sees no error in the ALJ's line of questioning of the vocational expert on this matter.

The court notes, however, that since the vocational expert did not consider plaintiff's elbow and arm impairment, the expert's opinions are flawed. On remand, a new vocational analysis must be conducted considering the arm impairment, after the ALJ reconsiders the other matters identified above regarding plaintiff's credibility and ability to lift, stand, sit, and walk, and need for rest breaks.

The question of disabling pain is often a troublesome one, due to its subjective nature and the nebulous judicial criteria for evaluation. The present case is a close one, requiring remand for additional fact finding.

**IT IS BY THE COURT THEREFORE ORDERED** that defendant's motion to affirm decision of the Secretary (Doc. 9) is hereby denied.

**IT IS FURTHER ORDERED** that plaintiff's motion for an order reversing the Secretary's decision (Doc. 7) is hereby granted. The decision of the Secretary is reversed, and the action is hereby remanded to the Secretary for further proceedings consistent with this opinion and order.