**Dorris E. McDONALD, on Behalf of J.C. McDONALD, Deceased, Plaintiff,**

v.

**Donna E. SHALALA,[1] Secretary of Health and Human Services, Defendant.**

Civ. A. No. 92–4175–DES.

United States District Court, D. Kansas.

Oct. 28, 1993.

---

1. Pursuant to Fed.R.Civ.P. 25(d)(1), the court substitutes Donna E. Shalala as defendant in place of Dr. Louis W. Sullivan.

**368**

Thomas J. Leising, Topeka, KS, for plaintiff.

Jackie A. Rapstine, Office of U.S. Atty., Topeka, KS, for defendant.

## MEMORANDUM AND ORDER

SAFFELS, Senior District Judge.

This matter is before the court on plaintiff's motion to remand or, in the alternative, reverse the Secretary's denial of disability benefits under Title II of the Social Security Act (Doc. 6). In response, defendant Secretary of Health and Human Services moves to affirm the Secretary's decision (Doc. 8).

Having reviewed the record of the case and for the reasons set forth in this order, the court affirms the Secretary's decision.

### Procedural History

On December 26, 1989, Mr. J.C. McDonald ("claimant") applied for disability insurance benefits under Title II of the Social Security Act. Claimant alleged a disability onset date of September 25, 1986. On July 27, 1990, the Social Security Administration ("Administration") awarded benefits and established a disability onset date of January 1, 1990. On November 26, 1990, the Administration revised their earlier decision and established a disability onset date of September 1, 1989.

On February 4, 1991, claimant, alleging a disability onset date of January 1, 1988, requested reconsideration of the Administration's disability onset date decision. On February 25, 1991, the Administration denied his request.

Claimant died on February 13, 1991. Following her husband's death, Mrs. McDonald requested both that she be made a substituted party on his behalf and that she receive an administrative hearing on the issue of his disability onset date. The hearing was held on August 14, 1991. At the hearing, her request to be made a substituted party was granted.

On August 21, 1991, the Administrative Law Judge ("ALJ") rendered a decision denying Mrs. McDonald's request to revise the disability onset date.

On October 23, 1991, Mrs. McDonald requested review by the Appeals Council of the Social Security Administration ("Appeals Council"). On May 29, 1992, the Appeals Council denied her request for review.

The ALJ's decision stands as the Secretary's final decision.

### Plaintiff's Medical History

In his application for disability benefits, claimant stated he was born April 18, 1930. He alleged disability beginning September 25, 1986. In his request for reconsideration, claimant revised his claimed onset date of disability to January 1, 1988.

Treatment notes from Dr. M. Moshref reveal the following: on September 15, 1986, claimant complained of ringing in his ears, he reported feeling like his head was in a "clamp," and his blood pressure was 160/100; on September 22, 1986, Dr. Moshref noted claimant was nervous and concerned about being "retired" after 30 years, his blood pressure was 165/100, and Dr. Moshref's notes refer to hypertension; on September 30, 1986, claimant reported an episode where he had difficulty forming words, he complained of pressure in his head, and Dr. Moshref's notes state that claimant was " 'TOTALLY DEVASTATED' " by his termination.

The record also contains three detailed medical reports prepared by three different doctors. The reports were prepared in furtherance of claimant's California worker's compensation claim. The first report was prepared on December 12, 1986, by Dr. Ira Monosson. Dr. Monosson examined claimant on November 7, 1986. The second report was prepared on January 20, 1988, by Dr. Gerald Weingarten. Dr. Weingarten examined claimant on January 14, 1988. The third report was prepared on May 19, 1988, by Dr. Alvin Markovitz. Dr. Markovitz examined claimant on May 19, 1988.

At the conclusion of Dr. Monosson's December 12, 1986, report, he lists his diagnoses as follows: (1) hypertension; (2) recent transient ischemic attack; and (3) adjustment disorder with anxiety and depression.

Dr. Monosson notes claimant was under a significant degree of emotional stress while employed at Colony Paints. He believed the stress claimant experienced on the job aggravated his hypertension. He recommended that claimant be restricted to jobs with no more than minimal emotional strain. Additionally, he recommended claimant avoid heavy lifting so as not to aggravate his hypertension. He wrote that claimant "has been rendered permanently and totally disabled for his usual and customary occupation as a regional sales representative with Colony Paints." Additionally, he noted claimant should be referred to a psychiatrist for treatment of his stress related anxiety and depression.

At the conclusion of Dr. Weingarten's January 20, 1988, report, he lists his diagnoses as follows: (1) primary hypertension; and (2) chronic obstructive pulmonary disease.

Dr. Weingarten observed what he stated to be the natural progression of primary hypertension. He did not believe claimant's employment with Colony Paints "caused, aggravated, or accelerated his hypertension condition." Additionally, Dr. Weingarten noted claimant had an elevated blood pressure and mild to moderate chronic obstructive pulmonary disease. Dr. Weingarten concluded as follows:

[Claimant] has a disability precluding heavy work. In regards to his hypertension condition, he just has a prophylactic disability precluding very heavy lifting.... Mr. McDonald is not disabled from his usual and customary employment as a sales representative with the Colony Paint Company. He is only restricted prophylactically from chronic undue emotional stress or strain.

At the conclusion of Dr. Markovitz's May 19, 1988, report, he lists his diagnoses as follows: (1) stress induced hypertension without secondary damage; (2) chronic obstructive pulmonary disease; and (3) anxiety and nervousness with tremor.

In his report, Dr. Markovitz takes exception with aspects of both Dr. Monosson and Dr. Weingarten's reports. Dr. Markovitz does not believe Dr. Monosson is justified in placing a "heavy lifting" restriction on claimant's employment status. He does not agree with the implicit connection Dr. Monosson draws between heavy lifting and aggravation of hypertension. Dr. Markovitz strongly disagrees with Dr. Weingarten's conclusion that claimant's hypertension is unrelated to the employment environment at Colony Paints. Dr. Markovitz blames the stress attendant to claimant's position at Colony Paints for his hypertension and related problems.

Dr. Markovitz concluded as follows:

[Claimant] should avoid 'undue emotional stress.'

The patient cannot return to his former occupation, at least to the same place, but he could do the same type of work at a different location....

It is my judgment that there is absolutely no question that the stresses of his occupation precipitated his hypertension, in the absence of which he would not have had hypertension.

He should avoid undue emotional stress. It is work related.... His disability is to avoid undue emotional stress. He does not need to avoid heavy lifting.

The record shows no further medical treatment until January 17, 1990. On this date, claimant was admitted to the hospital after coughing up two and a half cups of blood. Chest X-rays revealed bilateral apical pleural thickening. Claimant was discharged on September 20, 1990.

Claimant returned to the hospital on March 10, 1990. He complained of a headache. During testing, a mass was detected on his right lung. A pathology report dated March 30, 1990, confirmed the mass was malignant.

Claimant died February 13, 1991.

### Plaintiff's Work History

Claimant worked for Colony Paints for some 30 years. On September 25, 1986, he

was terminated. He did not hold a regular job thereafter.

While employed by Colony Paints, claimant acted as a salesman. He had an extensive sales territory, spanning most of southern California. Servicing his territory required him to drive 50,000–60,000 miles per year. Additionally, his job required him to meet with retailers, set up displays, carry boxes of paint, and shelve cans of paint and paint supplies. At the hearing, the vocational expert testified his job could be classified as at least medium exertional skilled work, possibly heavy exertional skilled work. The record reflects that claimant was a successful salesman in that he received several job performance awards from his company. In fact, several weeks before he was terminated the company sent him, along with a few other salespeople, on a fishing trip to Canada as a job performance award.

Following his termination, claimant prepared a resume and began searching for a job. He hired a headhunter to assist him. However, he was unable to find a job.

Around January 1, 1987, he and his wife moved to Phoenix, Arizona, where they purchased a home. Claimant improved the home by installing an underground watering system and building two decks. During this time, claimant complained of pain in and under his right arm. He also continued to look for a job.

In 1988 claimant moved back to Kansas. Mrs. McDonald remained in Phoenix for several months. While in Kansas, he purchased a mobile home and began building an addition onto it. However, he did not complete the addition. Mrs. McDonald testified his pain prevented him from completing the work.

In 1988 claimant pursued several self-employment opportunities. He agreed to wallpaper an entire house and he also agreed to refinish several pieces of furniture. He was able to complete only two rooms of the house. He could not complete the house because he could not raise his right arm. Additionally, he was unable to finish refinishing the furniture on time and did not charge the customer.

Mrs. McDonald testified that following his termination claimant became introverted and depressed. These traits were exacerbated by his inability to find a job. Additionally, he withdrew from everyone except family and old friends. When asked why he moved to Kansas from Phoenix, he would respond to the effect that he had come back to die.

### Issues on Appeal

The issues on appeal are whether the Secretary's final decisions are consistent with the Social Security Act, regulations, and applicable case law, and whether the Secretary's findings of fact are supported by substantial evidence. Mrs. McDonald challenges the Secretary's decision to establish September 1, 1989, as the onset date of disability. She argues the ALJ erroneously denied claimant's request to establish January 1, 1988, as the onset date of his disability. Specifically, Mrs. McDonald alleges the following three errors: (1) in light of claimant's nonexertional impairments, the ALJ incorrectly applied the grids and Rule 202.07; (2) the ALJ failed to assess Mrs. McDonald's credibility with sufficient specificity; and (3) the ALJ misinterpreted the vocational expert's testimony regarding the nature and extent of claimant's vocational adjustment.

### Scope of Review

■ Judicial review of the Secretary's decision is limited. *Hamilton v. Secretary of Health and Human Services,* 961 F.2d 1495, 1497 (10th Cir.1992). The court's function is to determine (1) whether the Secretary applied the proper legal standards and (2) whether the Secretary's decision is supported by substantial evidence. *Id.* at 1497–1498.

■ If the Secretary's factual findings are supported by substantial evidence, the court must give them conclusive effect. 42 U.S.C. § 405(g). Substantial evidence is evidence which a reasonable person might find sufficient to support a particular conclusion. *Richardson v. Perales,* 402 U.S. 389, 401–402, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971). Further, substantial evidence must be more than a mere scintilla, *Id.* at 403, 91 S.Ct. at 1428, but may be less than a preponderance.

*Flint v. Sullivan,* 951 F.2d 264, 266 (10th Cir.1991). However, evidence is not substantial if it amounts to mere conclusion or is overwhelmed by other evidence, particularly that offered by treating physicians. *Knipe v. Heckler,* 755 F.2d 141, 145 (10th Cir.1985).

■ The search for substantial evidence does not permit the court to weigh the evidence or substitute its judgment for that of the agency. *See Jordan v. Heckler,* 835 F.2d 1314, 1316 (10th Cir.1987) (stating that "[i]n determining whether the ALJ's resolution of the pain question was based on substantial evidence, we may not weigh the evidence nor substitute our judgment for that of the agency"). "As long as substantial evidence supports the ALJ's determination, the Secretary's decision stands." *Hamilton,* 961 F.2d at 1500.

■ Finally, in applying these standards, the court must bear in mind that the purpose of the social Security Act is to ameliorate some of the rigors of life for those who are disabled or impoverished. *Dvorak v. Celebrezze,* 345 F.2d 894, 897 (10th Cir.1965); *Sand v. Shalala,* 820 F.Supp. 1299, 1302 (D.Kan.1993); *Stonebreaker v. Shalala,* 827 F.Supp. 1531, 1533 (D.Kan.1993).

### *Discussion*

A claimant has the burden of proving disability. 42 U.S.C. § 423(d)(5). A disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

■ When analyzing a claim for disability benefits under the Social Security Act, an ALJ must follow a five-step procedure. *Trimiar v. Sullivan,* 966 F.2d 1326, 1329 (10th Cir.1992). The Tenth Circuit summarized the procedure as follows:

The Secretary has established a five-step evaluation process under the Social Security Act for determining whether a claimant is disabled within the meaning of the Act. The claimant bears the burden of proof through step four of the analysis. Once it is determined at step four that a claimant cannot perform his past relevant work, the claimant has established a prima facie case of disability. At step five, the burden shifts to the Secretary to show that a claimant can perform work in the national economy. The Secretary must consider a claimant's residual functional capacity, age, education, and work experience.

*Nielson v. Sullivan,* 992 F.2d 1118, 1120 (10th Cir.1993). The Secretary meets the burden at step five if the decision is supported by substantial evidence. *Thompson v. Sullivan,* 987 F.2d 1482, 1487 (10th Cir. 1993).

In the instant case, the Secretary's decision turns on step five of the analysis. Based on the ALJ's review of the record and testimony from the hearing, he concluded claimant was able to perform work in the national economy up to September 1, 1989. Therefore, the ALJ denied Mrs. McDonald's request to revise the onset date of claimant's disability from September 1, 1989, to January 1, 1988.

On review, the court examines whether the Secretary met the burden of proving claimant was able to perform work in the national economy prior to September 1, 1989. More particularly, the court's concern is whether the Secretary's decision that claimant was able to perform such work prior to September 1, 1989, is supported by substantial evidence.

As Mrs. McDonald acknowledges, the gist of her argument on appeal is that the ALJ failed to combine impairments when he evaluated the type of work, if any, claimant was able to perform prior to September 1, 1989. Specifically, she argues that the following three errors require reversal: (1) the ALJ's use of the grids and Rule 202.7 in light of claimant's non-exertional impairments; (2) the ALJ's alleged failure to assess Mrs. McDonald's credibility with sufficient specificity; and (3) the ALJ's alleged misinterpretation of the vocational expert's testimony regarding degrees of vocational adjustment.

### *The ALJ's Use of the Grids*

■ Mrs. McDonald alleges the ALJ erred by applying the grids and Rule 202.07

without considering the effect of claimant's non-exertional impairments. The gist of her challenge seems to be that reliance on the grids alone does not amount to substantial evidence and therefore does not enable the Secretary to meet the step five burden.

■■■■ If a claimant's residual functional capacity and other relevant characteristics exactly fit one of the Secretary's grids, then the Secretary may use the grid to meet the step five burden of proof. *Gatson v. Bowen*, 838 F.2d 442, 446 (10th Cir.1988). Where significant non-exertional impairments exist, the ALJ should not apply the grids conclusively. *Id.* Instead, "[t]he grids may serve only as a framework to determine whether sufficient jobs remain within a claimant's range of residual functional capacity." *Hargis v. Sullivan*, 945 F.2d 1482, 1490 (10th Cir.1991).

In his decision, the ALJ did not conclusively apply the grids. The ALJ's decision reflects a consideration of the effects of both exertional and nonexertional impairments. The court does not accept Mrs. McDonald's argument that the ALJ relied solely on the grids in concluding claimant was not disabled prior to September 1, 1989. In fact, it appears from the ALJ's decision that he used the grids only as a framework to determine whether sufficient jobs remained within claimant's range of residual functional capacity, a use of the grids which is permissible where both exertional and nonexertional impairments are present.[2] The ALJ's discussion on p. 5 of his decision belies Mrs. McDonald's claim that the ALJ conclusively applied the grids without giving any consideration to claimant's nonexertional impairments. At page 5, the ALJ wrote as follows:

Substantial evidence, including reports of examining physicians, the medical evidence of record, and to some degree the witness's testimony, establishes that claimant's impairments, as they existed prior to September 1, 1989, could reasonably be expected to prevent him from performing more than "light" work activity as defined in Social Security Regulations. Additionally, claimant suffered from an adjustment disorder with anxiety and depression which resulted in a slight restriction of activities of daily living, slight difficulties in maintaining social functioning, and seldom deficiencies in concentration.... Further, claimant would be unable to engage in employment that exposed him to undue emotional stress or strain.

(Tr. 13).

He also incorporated into his decision the opinions of a vocational expert whom he called at the hearing.[3] The expert testified that claimant possessed skills transferable to other types of work available in the national economy. She also gave an opinion about the degree of vocational adjustment claimant would experience in a move to a different job.

The record contains substantial evidence that indicates claimant needed to restrict the environment in which he utilized his transferable skills. Both Dr. Monosson and Dr. Markovitz noted that claimant could not return to the high stress environment at Colony Paints. Indeed, there is substantial evidence in the record that the high stress environment at Colony Paints was responsible for his hypertension and related psychological problems. Accordingly, the ALJ noted that the record "establishes that [claimant's] stressful job situation is what caused claimant's hypertension, as well as his anxiety and nervousness." *Id.* Therefore, the ALJ concluded claimant "would be unable to engage in employment that exposed him to undue emotional stress or strain." (Tr. 5).

---

2. The court expressly rejects Mrs. McDonald's argument insofar as she contends that the presence of nonexertional impairments prohibits the ALJ from any use of the grids. See *Channel v. Heckler*, 747 F.2d 577, 582 n. 6 (10th Cir.1984) (noting that "the mere presence of a nonexertional impairment does not automatically preclude reliance on the grids. Use of the grids is foreclosed only [t]o the extent that nonexertional impairments further limit the range of jobs available to the claimant").

3. The ALJ's decision to call a vocational expert comports with the following instruction from *Hargis v. Sullivan:* "[w]henever a claimant's residual functional capacity is diminished by both exertional and nonexertional impairments, the Secretary must produce expert vocational testimony or other similar evidence to establish the existence of jobs in the national economy." *Hargis,* 945 F.2d at 1491.

The ALJ's analysis is inconsistent with Mrs. McDonald's claim that he did not consider the effects of claimant's nonexertional impairments. The ALJ's consideration of the effect of claimant's nonexertional impairments appears to have motivated the ALJ's conclusion that claimant was unable to work in an environment where he would be exposed to undue emotional stress and strain. Indeed, by acknowledging claimant's inability to work in a stressful environment, the ALJ acknowledges a limitation that is the effect of the combination of claimant's exertional and nonexertional impairments.

Mrs. McDonald also argues the lack of psychiatric evidence in the record is due to the Secretary's failure to purchase a psychiatric evaluation in 1990. A psychiatric evaluation done in 1990 would not necessarily be probative of claimant's psychiatric condition on January 1, 1988. By late 1990, claimant was suffering from terminal cancer, a condition which could have impacted on his emotional, as well as physical, health. Moreover, the examinations done, and reports produced, by Doctors Monosson, Weingarten, and Markovitz included evaluations of claimant's mental state, and the effect it had on his physical condition, especially the role emotional stress and strain had on his hypertension and related disorders (e.g., anxiety, nervousness, or depression).

There are three detailed medical reports in the record. At least two of these reports support the ALJ's conclusion that Colony Paints was the source of claimant's hypertension and related problems. All three of the reports indicate, if not conclude outright, that claimant was able to return to the workforce. Although the reports disagree as to the desirable restrictions to be placed on claimant's future work environment, even Dr. Monosson, who, of the three, believed claimant's condition to require the most restrictions, indicated he could return to the workplace if subjected to only "minimal emotional stress and strain." (Tr. 127).

Of the three mentioned examining physicians, at least two attributed claimant's hypertension and related problems (i.e., anxiety and depression) to the stressful environment at Colony Paints. Additionally, of the three mentioned examining physicians, two, Dr. Weingarten and Dr. Markovitz, examined claimant after his alleged onset date of disability. Both Dr. Weingarten and Dr. Markovitz concluded that claimant was able to reenter the workforce. Neither Dr. Weingarten nor Dr. Markovitz reported any trait which would prevent the claimant from returning to a sales oriented position. Indeed, Dr. Markovitz, who examined claimant as late as May 19, 1988, some five months after claimant's alleged onset date of disability, stated claimant "could do the same type of work [i.e., sales representative] at a different location." (Tr. 154).

The ALJ's decision is consistent with the report of the last physician to examine claimant: Dr. Markovitz. Dr. Markovitz examined claimant after his alleged onset date of disability. Not only did Dr. Markovitz conclude claimant was able to work after claimant's alleged onset date of disability, but he also attributed claimant's exertional and nonexertional problems to the stressful work environment at Colony Paints. The ALJ acknowledged claimant's workplace limitations when he noted that "claimant would be unable to engage in employment that exposed him to undue emotional stress or strain." (Tr. 5). Thus, the ALJ acknowledged the limitations which claimant's nonexertional impairments placed upon him. The ALJ recognized his need to remain in a low stress environment and, contrary to Mrs. McDonald's allegations, the ALJ's decision demonstrates he took it into consideration when determining whether claimant was disabled prior to September 1, 1989.

Additionally, even though a separate psychiatric examination was not done, a psychiatric review of the record was conducted on November 20, 1990, by Dr. G.R. Ibarra, a regional medical consultant. Apparently, the psychiatric review of claimant's record was motivated by a statement which Dr. Daniel Zimmerman, another regional medical consultant, included in his medical review of claimant's record. Dr. Zimmerman noted that "[claimant's] emotional condition ... may need to be considered by the psychiatric staff within the Regional Office as to any earlier onset related to his psychiatric prob-

lems." (Tr. 110). Apparently in response, and after reviewing claimant's record, Dr. Ibarra wrote as follows:

I reviewed this case closely and, even though there is evidence that claimant was indeed in distress, there is no evidence of a major psychiatric syndrome that would have resulted in significant dysfunction. In essence, from the psychiatric standpoint, there was evidence of significant subjective distress but no evidence of actual vocational dysfunction or impairment.

(Tr. 111).

Indeed, there is no evidence in the record supporting Mrs. McDonald's testimony that claimant could not work as a salesman during the relevant time period due to serious psychiatric problems. Both of the physicians who examined claimant after his alleged onset date of disability reported that he could return to the workforce as a salesman (although under certain restrictions regarding stress). The ALJ, applying a *Luna v. Bowen*[4] analysis, found Mrs. McDonald's testimony not to be credible. Therefore, the ALJ did not address the effect of certain psychological traits unique to Mrs. McDonald's testimony when he examined the effect the combination of exertional and nonexertional impairments had on claimant's ability to perform substantial gainful employment. That is, because the ALJ found her testimony not to be credible, the ALJ did not discuss the effect his alleged "loss of the salesman's demeanor" would have had on claimant's ability to perform substantial gainful employment. Mrs. McDonald's only challenge to that finding focuses on the specificity of the ALJ's credibility analysis and the court addresses it in the next section of this discussion.

Although the ALJ did not examine the effects of claimant's alleged "loss of the salesman's demeanor," he did examine the combined effects of claimant's other exertional and nonexertional impairments. As a result he decided that the combination of claimant's impairments precluded him from working in an environment where he would be subjected to undue emotional stress and strain. However, he did not find that claimant was disabled prior to September 1, 1989, a conclu-

sion which is supported by substantial evidence easily gleaned from the extensive medical record and transcript of the vocational expert's testimony.

In conclusion, the court believes the ALJ's decision that claimant was not disabled prior to September 1, 1989, is supported by substantial evidence. Specifically, the court rejects Mrs. McDonald's argument that the ALJ erred by relying solely on the grids and not considering the combination of exertional and nonexertional impairments. After review of the ALJ's decision, the court is persuaded that the ALJ used the grids merely as a framework and did not apply them conclusively. Moreover, the court is persuaded the ALJ examined the combined effects of relevant exertional and nonexertional impairments and did not rely solely on an application of the grids.

### The ALJ's Alleged Failure to Assess Mrs. McDonald's Credibility

■ Mrs. McDonald argues the ALJ erred because he did not assess her credibility with sufficient specificity. In support, she cites to *Claassen v. Heckler*, 600 F.Supp. 1507 (D.Kan.1985).

■ Before examining Mrs. McDonald's argument, the court notes that credibility determinations are left to the ALJ as trier of fact, and ordinarily great deference is given to the ALJ's decision. E.g., *Casias v. Secretary of Health and Human Services*, 933 F.2d 799, 801 (10th Cir.1991); *Fowler v. Bowen*, 876 F.2d 1451, 1455 (10th Cir.1989).

Mrs. McDonald appears to base her argument on the following passage from the *Claassen* opinion: "[w]here the ALJ does not fully believe Plaintiff's subjective testimony . . . he is required to make specific findings and state his reasons for disbelieving evidence or testimony supporting his belief." *Id.* at 1511.

In his decision, the ALJ clearly indicates he believes Mrs. McDonald's testimony was exaggerated and he supports his conclusion with substantial evidence. At finding No. 5, the ALJ wrote as follows:

4. *Luna v. Bowen*, 834 F.2d 161 (10th Cir.1987).

The witness's testimony as to the severity of claimant's subjective complaints and associated functional limitations is found not credible when considered in light of the lack of objective medical evidence, lack of treatment history, inconsistencies between the testimony and reports of examining physicians, the described activities of claimant in 1987, and the other considerations discussed more fully in the Evidence, Evaluation, and Rationale section of the decision.

(Tr. p. 7). As the ALJ noted in finding No. 5, he discussed the factors present in the record and elicited at the hearing which had a bearing on his credibility determination. In the instant case, the ALJ examined significantly more information, and with significantly greater specificity, than did the ALJ whose credibility determination was examined in *Claassen*.[5]

The court finds that the ALJ's discussion of the evidence supporting his credibility determination satisfies the specificity requirement which Mrs. McDonald gleans from *Claassen*. Therefore, the court rejects Mrs. McDonald's argument that the ALJ's credibility finding lacks sufficient specificity.

### The ALJ's Alleged Misinterpretation of Vocational Testimony

 Mrs. McDonald argues the ALJ misinterpreted the vocational expert's testimony. Although it is unclear, Mrs. McDonald seems to argue that the ALJ misinterpreted the expert's testimony as to the nature of the vocational adjustment involved in moving from a job as a sales representative at Colony Paints to a job in one of the areas listed by the expert.

Mrs. McDonald challenges the ALJ's conclusion that claimant possessed skills which would enable him to transfer to other skilled work with "minimal vocational adjustment." (Tr. 14). She argues this statement demonstrates the ALJ misinterpreted the substance of the expert's testimony. The court disagrees.

At page 42 of the hearing transcript, the following exchange took place between the ALJ and the vocational expert:

Q: Let me ask you this ... would there be significant adjustment, vocational adjustment, for a sales rep who for 30 years has been in the paint business.... Would there be a significant adjustment to go from that to another product not related to the paint or coating industry, to kind of broaden it—

A: It's the—

Q: —would there be a significant vocational adjustment?

A: —the skills and, the abilities would be pretty similar in that there would be similar work settings. The processes that you would go through in terms of meeting the new customers and, and, you know, promoting your project would—product would be similar in capacity. Similar tools and equipment would be used in those sales capacities.

Q: So you—

A: I would see them as, as, as minimal readjustment—certainly be some readjustment just in the change of, of the job, but it would be minimal in terms of changing the product.

(Tr. 68). Although recognizing the adjustment inherent in changing a job, the vocational expert clearly indicates the claimant would undergo minimal vocational adjustment if he changed to a lighter product line. Based on the testimony reproduced above, the court is unable to find critical error in the ALJ's statement that claimant possessed skills transferable to other relevant work with minimal vocational adjustment.

### Conclusion

**IT IS BY THE COURT THEREFORE ORDERED** that the plaintiff's motion (Doc. 6) is hereby denied.

---

5. In *Claassen*, the court stated that "[t]he ALJ in this case made no findings of credibility adverse to Plaintiff. Accordingly, his testimony must be taken as true." *Claassen*, 600 F.Supp. at 1511. (emphasis added).

**IT IS FURTHER ORDERED** that the Secretary's motion (Doc. 8) is hereby granted and the Secretary's decision is affirmed.