51 F.3d 265
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Nadine Bouyer COBB, Plaintiff-Appellant,
v.
Donna E. SHALALA, Secretary of Health and Human Services,
Defendant-Appellee.
 No. 94-1924.
 United States Court of Appeals,
Fourth Circuit.
 Argued Jan. 30, 1995.
Decided: April 5, 1995.
 
 ARGUED: John Simon Whitelaw, APPALACHIAN RESEARCH AND DEFENSE FUND, INC., Beckley, West Virginia, for Appellant. Lori Riye Karimoto, Office of the General Counsel, DEPARTMENT OF HEALTH AND HUMAN SERVICES, Philadelphia, Pennsylvania, for Appellee. ON BRIEF: Charlotte Hardnett, Chief Counsel, Region III, Dorothea J. Lundelius, Division Chief, Thomas S. Inman, Assistant Regional Counsel, Office of the General Counsel, DEPARTMENT OF HEALTH AND HUMAN SERVICES, Philadelphia; Pennsylvania; Rebecca A. Betts, United States Attorney, Stephen M. Horn, Assistant United States Attorney, Charleston, West Virginia, for Appellee.
 Before ERVIN, Chief Judge, MOTZ, Circuit Judge, and PHILLIPS, Senior Circuit Judge.
 OPINION
 PER CURIAM:
 
 
 1
 Nadine Cobb appeals from the district court's order affirming the Secretary of Health and Human Service's denial of Supplemental Security Income ("SSI") benefits under Title XVI of the Social Security Act. Cobb asserts that the Secretary's decision is not supported by substantial evidence and that relief should be provided under the Act. The Administrative Law Judge (ALJ) who conducted the final administrative review of this case in May 1992 was in the best position to evaluate the contradictory evidence presented about Cobb's physical and mental impairments. The Secretary based her conclusion on the findings of the ALJ, findings that we hold are supported by substantial evidence. Cobb also challenges the denial of benefits based on inadequate instructions that the ALJ provided to a vocational expert who testified as to Cobb's ability to find gainful employment. In posing a hypothetical to the expert, the ALJ fairly considered the medical testimony provided by both parties. For the reasons set forth below, we affirm the judgment of the district court.
 
 I.
 
 2
 Cobb claims she suffers from physical and psychological injuries sustained in a series of automobile accidents during the 1980s. A 1988 accident resulted in broken bones in Cobb's face, the most serious of which was the fracture of her left eye socket. She underwent two surgical procedures in order to repair the damaged left orbit. In 1989, Cobb was involved in another accident that left her with substantial injuries to her neck and back.
 
 
 3
 Cobb began seeing a neurologist, Dr. William Merva, on a regular basis after the 1989 automobile accident. Between November 1989 and April 1990, Dr. Merva evaluated Cobb's condition on seven different occasions. On each of Cobb's visits, the doctor took substantial notes--all of which were included as evidence at the hearing before the ALJ. Although Cobb's visits to Dr. Merva were fairly regular during that six month period, there is no indication in the record that Dr. Merva examined Cobb again until February 4, 1991, ten months after her last visit. Dr. Merva's notes from the examination of February 4, as well as those taken five weeks later during a follow-up visit, reveal a significant improvement in Cobb's condition. Although Cobb had not been "on any medication for sometime," she was not experiencing much pain in her arms in early February. Dr. Merva's summary of Cobb's condition on March 13, was similarly positive. He wrote that "[t]he patient is doing very well on 100 mg. Imipramine." Additionally, Dr. Merva noted that Cobb was sleeping more easily, even though she continued to experience neck pain.
 
 
 4
 Despite the two isolated examinations in February and March of 1991, Cobb had not been under Dr. Merva's regular care for nearly a year when the physician offered the following opinion in April 1991 about his patient's ability to hold a job:
 
 
 5
 Ms. Nadine Bouyer Cobb has been under my care for a cervical sprain with neck pain and headaches. She has been unable to hold gainful employment since at least January of 1991, and will continue to be unable to work for at least 12 months.
 
 
 6
 Dr. Merva's blanket determination that Cobb would be unable to work for another year was not consistent with the positive remarks that he had made about Cobb's condition in February and March. Moreover, the degree to which Cobb was "under Dr. Merva's care" is questionable, because the doctor had not evaluated Cobb's condition for a ten month period prior to February 4. Moreover, the record indicates that after March 13, Dr. Merva never treated Cobb again.
 
 
 7
 Dr. Merva's opinion concerning the seriousness of Cobb's injuries is contradicted by the assessments of other specialists who examined Cobb within days of the 1989 accident. Dr. David Santrock, an orthopedic surgeon, noted two days after the automobile injury that "Cobb had full range of motion of the cervical spine, without pain, and was asymptomatic." Although an MRI indicated a bulge in one of her vertebrae, neurosurgeon Arthur Gindin determined that there was no nerve damage. Dr. Gindin was unable to determine the cause of Cobb's pain in her lower extremities.
 
 
 8
 In addition to addressing these physical disabilities, the hearings before the ALJ also focused on Cobb's psychological problems. In December 1989 and again in January 1990, Cobb was examined by clinical psychologist Constantine Demopoulos, who had been recommended by Cobb's attorney. An intelligence test revealed that Cobb has an IQ of 79, which places her on the borderline of being mentally retarded. Demopoulos' ultimate conclusion was that Cobb suffered from psychoneurotic disorder, was deeply depressed, and was a poor candidate for employment. At her attorney's behest, Cobb also saw psychiatrist Riaz Uddin Riaz, whose prognosis mirrored that offered by Demopoulos. The diagnoses provided by the two specialists were identical--generalized anxiety disorder, severe, chronic; major depression, severe, chronic; and borderline range of intelligence.
 
 
 9
 Riaz's and Demopoulos' evaluations of Cobb's condition were markedly more pessimistic than were the evaluations of psychiatrists Powell and Andrews who were brought in as consultants by the Department of Health and Human Services. Powell noted that Cobb had few complaints other than the fact that she heard voices in her head three to four times a week. Cobb was alert, cooperative, and talkative in her meeting with Powell, so much so that Powell's only finding was that Cobb may have been under the influence of alcohol. Powell's overall conclusion was that it was "doubtful" that Cobb has a psychiatric diagnosis. No mental problems were evident in Powell's psychiatric evaluation. He assessed Cobb's ability to perform workrelated activities as "good" in almost all areas. Dr. Andrews conducted another IQ test which resulted in a score of 77--a result that again placed her in the borderline range of mental retardation. In his opinion, any depression that may have been evidenced by Cobb's behavior, however, "d[id] not reach a degree of clinical significance in terms of diagnostic criteria."
 
 II.
 A.
 
 10
 Our review of a denial of SSI benefits is limited to a determination of whether the Secretary's decision is supported by substantial evidence and whether the correct law was applied. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir.1990); 42 U.S.C. Sec. 405(g) (1988) ("[t]he findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive"). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). In Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir.1966), we stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Consistent with the deference that this court affords the Secretary, we do not weigh evidence or assess the credibility of witnesses. Hays, 907 F.2d at 1456. The Secretary, not the courts, has the ultimate responsibility for "making findings of fact and resolv[ing] conflicts in the evidence." Id.; see also Wilkins v. Secretary, DHHS, 953 F.2d 93, 96 (4th Cir.1991) (en banc) (quoting Huckabee v. Richardson, 468 F.2d 1380, 1381 (4th Cir.1972)) (" 'Reviewing courts are restricted to the administrative record in performing their limited function of determining whether the Secretary's decision is supported by substantial evidence.' ")
 
 
 11
 A treating physician's testimony is entitled to great weight and may be disregarded only if persuasive contradictory evidence exists. Coffman v. Bowen, 829 F.2d 514, 517-18 (4th Cir.1987). We have reversed judgments entered in favor of the Secretary, because the treating physicians' opinions had been ignored despite the lack of "persuasive contradictory evidence." Id. at 518; Wilkins, 953 F.2d at 96. In Coffman, the Secretary failed to give credit to a physician's conclusory statement about his patient's inability to work. The treating physician's opinion was supported by findings from three other doctors and, unlike this case, the Secretary never received testimony from a doctor with a contrary opinion. Similarly, in Wilkins we reversed the Secretary's denial of benefits, but again, no expert medical evidence had been offered to contradict the treating physician's assessment of the claimant's disabilities. Id. The Wilkins court was further disposed towards adopting the position taken by the treating physician since he was only "offer[ing] a retrospective opinion on the past extent of impairment." Id.
 
 
 12
 Dr. Merva's ultimate conclusion--that Cobb would be unable to work for an additional twelve months--is not the type of opinion that is entitled to "great weight" under Wilkins and Coffman. Although Coffman appears to have applied the so-called attending physicians rule in its strictest form, holding that the treating physician's opinion be disregarded only if there exists contradictory evidence, Coffman, 829 F.2d at 517, Wilkins made it clear that it is "a treating physician's opinion ... concerning the extent of past impairment " that may not be rejected in the absence of persuasive contradictory evidence. Wilkins, 953 F.2d at 96 (emphasis added). Dr. Merva had not treated Cobb on a continuous basis, his opinion related to Cobb's future abilities rather than to her past condition, and the ALJ was presented with substantial contradictory expert testimony. Each of these factors contributes to our holding that the ALJ acted properly in choosing not to adopt the position taken by Cobb's treating physician. While Dr. Merva's reports chronicle Cobb's complaints, his medical conclusions are no more powerful than those made by Doctors Santrock and Gindin.
 
 
 13
 Resolving conflicting testimony is the Secretary's responsibility, not the task of a reviewing court. Hays, 907 F.2d at 1456. In this instance, although Cobb had a strong advocate in Dr. Merva, it was within the Secretary's discretion to determine that the testimony of Doctors Santrock, Gindin, Powell and Andrews undermined the efficacy of Dr. Merva's conclusions.
 
 B.
 
 14
 We also find no merit to Cobb's claim that the ALJ failed to account sufficiently for all of Cobb's maladies in posing a hypothetical to the vocational expert. "The purpose of bringing in a vocational expert is to assist the ALJ in determining whether there is work available in the national economy which this particular claimant can perform." Walker v. Bowen, 889 F.2d 47, 50 (4th Cir.1989). In order for the expert's opinion to be helpful, it must be in response to a hypothetical which fairly sets out the claimant's impairments. Id. The hypothetical posed by the ALJ reflected enough of Cobb's characteristics to afford the vocational expert a meaningful basis on which to formulate an opinion. The ALJ asked:
 
 
 15
 Assume an individual the claimant's age, a high school education with literacy and basic mathematical skills, no past work experience and a residual functional capacity for work of a light exertional level with, although I find it's somewhat inconsistent with her educational background, a, [sic] at least perhaps a current functioning, mildly limited intellectual functional capacity of the upper borderline level that would perhaps preclude work involving the acquisition or utilization of significant mental skills. And the mild situational depression that would involve, that would preclude only work involving a great deal of stress. Are there any jobs in the national economy that exist in significant numbers that a, an individual with that age, education, vocational profile and that residual functional capacity could perform and if so can you name them and give the approximate numbers?
 
 
 16
 (emphasis added).
 
 
 17
 The ALJ's statement of Cobb's mental and emotional condition achieves a balance between the testimony offered by Demopoulos and Dr. Riaz, on the one hand, and Dr. Powell and Dr. Andrews, on the other. "Limited intellectual capacity of the upper borderline level" is consistent with the results of the intelligence tests administered by both Demopoulos and Andrews. Riaz's and Demopoulos' findings that Cobb suffered from psychoneurotic disorder did not match the assessment of Powell and Andrews who found Cobb to be fairly well adjusted. Andrews also concluded that any depression Cobb was experiencing did not rise to a clinically significant level. The hypothetical was not skewed in favor of either medical opinion. The vocational expert received an accurate assessment of Cobb's condition, one based on the substantial evidence that the ALJ had received. As a result, the ultimate opinion offered by the expert--that Cobb could perform a certain range of light work--was adequately supported by the record.
 
 III.
 
 18
 Prior to this dispute reaching federal district court, there had been no less than five occasions on which an ALJ had considered Cobb's claim. The ALJ who denied the claim on May 28, 1992, held two independent evidentiary hearings in which neurosurgeons, orthopedists, psychologists, and psychiatrists testified as to Cobb's condition. We find that the Secretary's denial of benefits is supported by substantial evidence and that the hypothetical posed to the vocational expert properly took into account all aspects of Cobb's condition. The judgment of the district court is accordingly
 
 
 19
 AFFIRMED..